## Case No. 1,174.

### BEAN v. SMITH et al.

[2 Mason, 252.][1]

Circuit Court, D. Rhode Island. June Term, 1821.

FRAUDULENT CONVEYANCES—ACTION TO SET ASIDE—EQUITY—JURISDICTION OF FEDERAL COURTS—BONA FIDE PURCHASER — JUDGMENT FOUNDED ON NEGOTIABLE CHOSE IN ACTION.

1. The circuit court, notwithstanding the restrictive clause in the judiciary act of 1789, [1

[1] [Reported by William P. Mason, Esq.]

Stat. 78,] c. 20, § 11, has jurisdiction in a suit in equity brought by a judgment creditor against his debtors and others, (they being citizens of different states,) to set aside conveyances made in fraud of creditors, although the ground of the judgment was a negotiable chose in action, on which, before judgment, a suit could not have been maintained in such court.

[Cited in Wood v. Dummer. Case No. 17,-944; Dundas v. Bowler, Id. 4,140; Pratt v. Curtis, Id. 11,375.]

2. A bill in equity lies to set aside such fraudulent conveyances, for there is not in the proper sense of the terms, "a plain, adequate and complete remedy" at law, within the meaning of the 16th section of the judiciary act of 1789, [1 Stat. 82,] c. 20, which is merely affirmative of the general doctrines of courts of equity.

[Cited in Baker v. Biddle, Case No. 764; Tufts v. Tufts, Id. 14,233; Phillips v. Preston, 5 How. (46 U. S.) 290; Orendorf v. Budlong, 12 Fed. 25; Mann v. Appel, 31 Fed. 383.]

3. A bona fide purchaser without notice from a grantee, to whom property has been conveyed to defraud creditors, is entitled to hold the same against the creditors of the grantor.

[Cited in Wood v. Mann, Case No. 17,951; In re Estes, 3 Fed. 142.]

4. Where in Rhode Island a judgment debtor had conveyed his real estate to defraud his creditors, and had afterwards been committed to gaol, and been discharged from imprisonment on taking the poor debtor's oath under the laws of that state, which could only be obtained by a person having no property to support himself in gaol, or to pay prison charges, it was held, that a bill in equity lay to set aside the fraudulent conveyances, and to charge the real estate with the judgment debt, notwithstanding that by the laws of that state, while the debtor was alive and lived within the state, such real estate would not be directly liable to be taken in execution.

5. Where a conveyance has been made with the meditated intent to defraud creditors, it shall not be permitted to stand as security in the hands of the grantee for advances made on account of such conveyance to the grantor.

6. Notwithstanding a judgment, the court will, where the judgment creditor asks relief against such fraudulent conveyance, look into the original consideration, and give the creditor only, what on the whole appears due to him.

[Cited in Lawrence Manuf'g Co. v. Janesville Cotton Mills, 138 U. S. 557, 11 Sup. Ct. 402.]

In equity. This was a bill in equity brought by the plaintiff [Stephen] Bean, against Simon Smith, Ziba Smith, Ahab Smith, Simon Smith, Jr., Esther Stone, William Foster, and Elizabeth Foster, wherein he claimed to be paid, out of certain lands in the possession of the respondents, a debt due to him from Simon Smith, one of the said respondents. The facts which came out in the bill and answers, were as follows: On the 22d day of December, 1808, the plaintiff was the holder of bills of the late Farmers' Exchange Bank to a large amount; for the payment of these bills William Colwell, the cashier of the said bank, drew two bills of exchange upon one Andrew Dexter, Jr., in favour of the respondent Smith, one for the sum of $3,063, and the other $1,500. These bills were indorsed in blank by Smith, one of the respondents, and by one John Harris, and were

received by the plaintiff in payment of the bank bills, which he held against the said bank as before mentioned. The said Smith and Harris were at the time directors and large stockholders in said bank. These bills of exchange were afterwards protested for non-acceptance and non-payment, and the endorsers Smith and Harris duly notified thereof. In March, 1809, two actions were commenced on these bills against Smith, and at the March term of the supreme court of the state of Rhode Island judgment was recovered in these suits against Smith for the sum of $5,052.37, debts and costs, and executions issued thereon, upon one of which he was committed to jail in May, 1810, and upon the other in September following. In the month of May, 1813, Smith took the poor prisoner's oath; gave his notes for the debt and costs, payable in two years, with interest, and was thereupon discharged from prison. The Farmers' Exchange Bank entirely failed in February, 1809, at which time Smith was indebted to the bank in the sum of $15,284. This debt to the bank he paid in their own bills in August, 1809, which were purchased for him for that purpose by one Seth Hunt for the sum of $2,273.80, for which last sum he gave his own notes indorsed by William Foster and Simon Smith, Jr., two of the respondents, who were afterwards sued on the same. After the commencement of the suits against Smith, and a few days before the sitting of the court, at which judgment was expected to have been obtained, the said Smith made conveyances of all his estate both real and personal, to his children. In September, 1809, he leased the Rounds and Wills farms, so called, to his sons-in-law William Foster and William Stone, (both of them made respondents,) for five years from 1st April, 1810, for the alleged consideration of $1,000. And on the same day he gave a deed of gift of the same farms to his two daughters Elizabeth and Esther, wives of the said Foster and Stone. No consideration was paid at the time, but they afterwards gave their notes to one Zephaniah Andrews for a part of a debt which the said Smith owed him, making themselves accountable to said Andrews in the sum of $483.48, each, or two-fifteenths of the debt due to said Andrews. On the 15th of September, 1809, Smith leased 54 acres of land in Smithfield, called the Waterman lot, to Ziba Smith, one of the respondents, for ten years, at the annual rent of $738, paid down. And on the same day he executed a deed of gift of the same lot to said Ziba in fee simple. He also conveyed to the said Ziba on the 18th of the same month of September 20 acres of woodland in Gloucester. On the 15th of the same month said Smith leased the Daniel Eddy farm, so called, to Darius Smith for five years from April 1, 1810, and three days after he conveyed it to the said Darius and Ahab Smith for the alleged consideration of $5,000, which they swear was paid to him. And the said Darius and Ahab afterwards conveyed the same to one Amasa Stone and one William Stone. On the 22d of November, 1809, the said Smith conveyed his homestead farm, the John Eddy farm, so called, to Ziba Smith and Simon Smith, Jr., for the alleged consideration of $8,000, which they averred, that they paid at the time by giving their notes for $4,000, each.

Whipple, for respondents.

The first question, to which the respondents call the attention of the court, is a question of jurisdiction. The plaintiff Bean is an assignee of John Harris, a citizen of the state of Rhode-Island, at least it does not appear that he is a citizen of another state, and the want of such an averment may be taken advantage of by motion. [Sere v. Pitot,] 6 Cranch, [10 U. S.] 332; 1 Mason, 250, [Bullard v. Bell, Case No. 2,121;] [Montalet v. Murray,] 4 Cranch, [8 U. S.] 47.

It may be said, that although this court could not sustain a suit for the collection of the debts, that still they may give redress for any injury, which the orator may have received in his character of creditor by the conveyances complained of; that their right to a remedy for this injury is not derived from John Harris, but that inasmuch as the injury is direct from the respondents to the orator, so must their remedy be directly against the respondents. It is admitted, that a new promise made by the promissor of a note directly to the indorsee will confer jurisdiction on this court, although the promissor and a first indorser are both citizens of this state. But it may well be doubted, whether an act in fraud of the rights of an assignee, confer the same jurisdiction as a new promise made directly to him. In the latter case, the new promise is the gist of the action, but not so with the fraudulent act. The court must first decide, that the orator is a bona fide creditor, before they can listen to any complaints of fraud. But if the court have no jurisdiction over the contract, which clothes him with the character of creditor, how can they decide that he is a creditor? How can the court give relief indirectly, when the statute forbids their doing it directly? How can the court give the orator a remedy for an injury to his rights as creditor, when the power to judge, whether the orator is a creditor or not, is not granted to the court? We contend, therefore, that as this court have not a jurisdiction strong enough to enforce the payment of the debt, said to be due from Simon Smith to the orator, that consequently they have no power over it. And if they have no power over the debt itself, they can give no relief for any act in fraud of that debt. If it is said, that the question of jurisdiction must be decided according to the state of facts at the commencement of the action, and that the orator at the time of preferring the present bill was a judgment creditor of Simon Smith, I will admit the conclusiveness of the argument so far as it relates to Simon Smith. I

will also admit, that the judgment is legal evidence against the respondents, who are not parties to them, for the purpose of proving the plaintiff to be a creditor of Simon Smith. But I do not admit, that the judgment of court obtained by the orator against Simon Smith six months after the obnoxious conveyances can at all affect the rights of those not parties to it. All the rights of the orator to prosecute the respondents accrued to him, when the conveyances of the real estates were made. And the question of jurisdiction must be settled according to the state of facts at that time. At that time the orator was assignee of John Harris, and it is submitted with some confidence, that if the orator could not maintain a suit in this court at the time the injury was committed, nothing which has been done since by Simon Smith and the orator, without the privity of the other respondents, will enable them to maintain a suit now.

We object, in the second place, to the jurisdiction of the court, because there is a plain, adequate, and complete remedy at law. In England, the courts of law and equity have concurrent jurisdiction in many cases. The case of fraud is emphatically one of the number. But the courts of the United States have not concurrent jurisdiction in any case, for the statute has confined the attention of courts of equity to cases, which cannot be heard in a court of law. The language of the statute is, where "plain, adequate, and complete remedy may be had at law." If, therefore, the orator has any remedy at law, this court cannot interfere, for the word "remedy" is as full of meaning when standing alone, as when accompanied with the words, "plain," "adequate" and "complete." It ceases to be a remedy the moment it ceases to be plain, adequate, and complete. The word "remedy" is technically confined to proceedings before judgment. Wherever a plaintiff can obtain judgment against another for any injury, he has a plain remedy. Whether he can obtain satisfaction of that judgment, depends on the ability of the defendant, and the local regulations of the state in which the judgment is obtained. 2 Bac. Abr. 685; Co. Litt. 289.

Has the orator, then, a remedy at law? In order to judge of this, we must take his case as it is stated. By the bill it appears, that Simon Smith has conspired with the other respondents to defraud the orator of his just debts. The conveyances are used as means only. Can there be any doubt, that at the common law a creditor can obtain judgment against those who conspire to defraud him of his just debts? Such actions are common in England and in this country. Not only are the conveyances void at law, but all parties to an actual fraud, whether in the sale of real or personal estate, are liable to an action on the case. A conveyance in fraudem legis merely, is subject to a different consideration. The circuit court of the United States, in deciding whether there is a plain remedy at law, is not to regard the statute laws of any particular state, nor suffer itself to be influenced by a regard to the practice prevailing in any of the courts of this, or any other state. If such considerations had weight, the jurisdiction of this court would not be fixed and established by a known and certain rule, but would change and fluctuate, in order to accommodate itself to the different rules prevailing in different states. This court, therefore, cannot regard the feeble jurisdiction of the courts in Rhode-Island, nor decide that the orator has not a remedy at law, because (except in certain cases) the laws of Rhode-Island do not allow the sale of real estate for the payment of debts. The language of the supreme court in [Russell v. Clark,] 7 Cranch, [11 U. S.] 89, is strong in affirmance of the doctrine here advanced. "It is true, (say the court) that if certain facts, essential to the merits of the claim, purely legally, be exclusively within the knowledge of the party against whom that claim is asserted, he may be required in a court of chancery to disclose those facts, and the court being thus rightly in possession of the cause, will proceed to determine the whole matter in controversy. But this rule cannot be abused by being employed as a mere pretext for bringing causes proper for a court of law, into a court of equity. If the answer of the defendant discloses nothing, and the plaintiff supports his claim by evidence in his own possession, unaided by the confessions of the defendant, the established rules limiting the jurisdiction of courts, require that he should be dismissed from the court of chancery, and permitted to assert his rights in a court of law."

By a reference to the cases before the court it will be perceived, that the deeds of the Rounds and Wells farms to the daughters of Simon Smith are deeds of gift, and void as against creditors both at law and in equity. The fee of the Waterman lot and the wood lot to Ziba is by a deed of gift. Can it be said, that as respects these conveyances the orator has not a plain, adequate, and complete remedy at law? Can they expect the respondents to disclose any facts "exclusively within their knowledge?" So far from this, the deeds are void on their very faces, and this court would not allow the respondents to offer any evidence in support of them. If a consideration had really been paid, parol evidence to prove the fact would be inadmissible.

Where, then, is the necessity of resorting to a court of equity to obtain relief against conveyances, which are void of themselves? If a necessity does exist, it arises not from any general defect in the laws, but from the peculiar statute in force in Rhode-Island, which does not allow the lands of a debtor to be seized or sold for the payment of his debts, so long as the debtor himself may be found. This is conceived to be the whole difficulty under which the orator labors, and

this difficulty must be removed by the legislature of Rhode-Island, not by this court. It is very clear, that so far as respects the deeds of gift, the orator has derived no aid from the answers of the respondents, and that the "established rules limiting the jurisdiction of courts require, that he should be dismissed from the court of chancery, and permitted to assert his rights in a court of law." The same rule applies with equal force to the other conveyances. Whatever fraud the orator may imagine, none is proved by the answers of the respondents, and if the orator has evidence in his own possession to prove the fraud, that evidence will be heard with the same patience in a court of law as in a court of equity.

This last objection to the jurisdiction of this court, (whatever doubts may be entertained of the first) is made from a sincere conviction, that it applies unanswerably to this case. It is not made from any fears entertained by the respondents of the issue of a contest on the merits of the case. They do assert, and have always asserted, that the conveyances from Simon Smith to his sons and sons-in-law, were not made with any fraudulent intention, but bona fide and for a valuable consideration.

Snow and Searle, for the plaintiff, contended as to the jurisdiction of the court, that at the time the original debt was contracted and the bills of exchange drawn, both the indorsers of these bills were citizens of Rhode-Island, and that the indorsee then was and ever since had been a citizen and inhabitant of Massachusetts; that all, or nearly all, the facts involved in this suit, took place in the former state. And they argued, that no suit by the indorsers against the maker, or by the second indorser against the first, could be maintained in this court, whilst all the parties continued to be citizens and inhabitants of Rhode-Island. But that the indorsee might have maintained a suit against his immediate indorser, for as between them the indorsement created a new contract. And if the two indorsers had removed from Rhode-Island, and become citizens of different states previous to the suit, there was no doubt but that this court would have jurisdiction of any suit between either the indorsers, or the indorsee and indorsers, or drawer, and of a suit between the holder and an indorser, although the drawer and both indorsers were citizens of Rhode-Island at the time the bill was drawn, and at the time the right of action accrued, and although all the material facts arose in that state.

The present complainant has prosecuted in the state court his demand on the bill of exchange, against Simon Smith, and has recovered judgment, and there can be no doubt, but that he can pursue in this court every remedy either at law or equity, which he has against Simon Smith, to recover the amount of that judgment. At the time of committing the frauds charged in the bill, the complainant was the holder of the drafts, and the frauds (if any) were perpetrated to his immediate injury, and he could at all times maintain his suit in law or equity against the perpetrators of this fraud, who were all citizens of this state, except as to Simon Smith, who, as an indorser, could not in the first instance be sued in the circuit court. But Smith, being now liable in this court for that debt, or for any act he has done to defeat the payment of it, and all the other parties having been always liable in this court, I am at a loss to discover any legal objection to the jurisdiction. But we apprehend there can be no doubt, but that this complainant might, without having resorted to the state court on his bill of exchange, have filed his bill in equity in the first instance in this court against Simon Smith and all the present respondents. He could not, it is true, have sued Simon here as indorser of the bill, but he was still a creditor of Simon, and the bill would have been legal evidence of a debt on the trial of the bill in equity. The bill in equity charges a fraud, and a conspiracy, to defraud the complainant, and if the fact could have been made out on the trial, I apprehend, that the complainant would have been entitled to a decree, although his remedy at law against one of the conspirators, might have been prosecuted before the state court.

As to the present question, we can perceive no difference between an assignee creditor, and an original creditor, or one to whom a promise is directly made. If he be a real creditor at the time of the supposed fraud, his rights and his remedy are abundantly sufficient to hold the delinquent accountable. Indeed, it is not very material, whether the party litigating be a creditor, or not, at the time of the fraud. A subsequent creditor may set aside transfers to defraud prior creditors. And if the very debt, to defeat the payment of which, the fraudulent transfers were made, is demanded in the present suit, it can avail nothing to the fraudulent party, that the debt has since passed into other hands. As to the existence of the debt against Simon Smith, we believe no question can be made about it. It is now established by judgment of court, and that judgment proves it existed as a debt at the times when the alleged frauds were committed.

The second objection to the jurisdiction rests on as feeble grounds as the first. The supreme court of the United States in the case of Ammidon v. Smith, 1 Wheat. [14 U. S.] 447, which grew out of the same transactions as the present, directed that the plaintiff had no remedy at law upon the bond given for the liberty of the jail yard, nor did they intimate the existence of any other remedy at law. And when the chief justice remarks in that case, (pages 458, 460,) that there "was so much turpitude in the act confessed by the demurrer," and that the de-

fence was so flagitious, the court found a difficulty in considering it as a naked point of law, and that the jurisprudence of Rhode-Island must be defective indeed, if it furnished no remedy for such a mischief, I presume he had a pretty direct reference to the kind of remedy we are now pursuing. The original demand is certainly merged in the judgment, the judgment as to all proceedings at law, seems to be satisfied by the issuing of execution, the commitment of the body, and the execution of the bond for the liberty of the jail yard. The only legal remedy, then, seems to be confined to the bond, and the court have decided, that there is no remedy at law against the parties to that bond.

If any right of action exists against these respondents jointly, it must be, I presume, a special action on the case, charging the defendants with a conspiracy to defraud, and, with having defrauded the complainants. But admitting this right of action to exist, it is no objection to the present suit. There are many cases, in which courts of law and equity have concurrent jurisdiction in relation to frauds, trusts, and contracts, and in perhaps three-fourths of the cases decided in equity, the complainant had some remedy at law, as in cases between co-partners for the settlement of their accounts. In almost every case of a bill filed for specific performance of a contract, the complainant might sue at law, and recover damages. In bills filed to compel the execution of trusts. In almost all those cases the complainant might sue at law. In numerous cases where accounts are to be taken, a bill is sustained, as a more convenient mode of settling them than by a jury. But where the bill is filed to set aside fraudulent conveyances, it seems to be peculiarly the right and duty of a court of equity to sustain it, and for one plain reason amongst many others, because a remedy or special kind of relief is asked, which cannot be granted at law, viz. that the fraudulent grantee be adjudged to re-convey, or convey to others, as the court shall direct, and that the fraudulent deed shall never after be set up as giving any title. This cannot be done in a trial at common law, for although a jury may incidentally find a conveyance fraudulent, yet the deed remains a subsisting deed, and the title is still in the fraudulent grantee, and the deed and the title under it may be re-asserted as often as the question of fraud is raised at law, but a court of equity sets the fraudulent deed aside, or directs a sale, or a re-conveyance by the grantee, and puts definitely an end to all dispute on the subject. And although some of the deeds are voluntary, and void on the face of them as to creditors, yet this is no objection to equity jurisdiction, but it seems to be equally at least the right and the duty of the judge in chancery, to set aside the deeds, and dispose of the property according to law and equity. But if the deeds, or any of them, are fraudulent and void, the grantee is undoubtedly accountable in equity for the rents and profits, and accounts may be necessary to be taken. I am not at present informed of any remedy at law, which the grantor or a creditor has against the fraudulent grantee, for these rents and profits. The grantee is concluded by his deed, and a creditor, or a purchaser on a creditor's execution, could not recover rents and profits accruing previous to his title. And it seems peculiarly the province of equity to decide all such questions, to the end, that full, adequate, and complete justice may be done to all parties. But suppose a deed should be partially or constructively fraudulent, and should be a valid security to a certain extent, but not to one quarter the value of the estate conveyed. In such a case, a court of law can pursue no middle course, but must treat the deed as entirely void, or as sufficient to convey the whole estate, and in either case injustice might be done. Equity, however, can reform, or rather conform, the deed to the justice of the case, by letting it stand as a security for the first amount, and decree it void as to the residue. In all these cases, I presume there can be no question as to the jurisdiction of a court of equity, and yet in all, or nearly all, of them, perhaps the creditor or creditors may have some kind of remedy, (adequate or inadequate) at common law.

There is nothing in the 7 Cranch, [11 U. S.] which militates against the positions we have stated, or the jurisdiction of the court in this case. All that the court meant to decide, was, that when the bill contains charges purely legal, and the complainant depends upon the defendant's answer to furnish proof of his equity claim, and the defendant denies every thing in his answer, the bill must be dismissed. And for a very plain reason, viz. there is no equity charged in the bill, and none disclosed in the answer. But the court never meant to decide, nor even to intimate, that where sufficient equity is charged in the bill, it is to be dismissed for want of jurisdiction, because the defendant denies the charges in his answer, but the case goes on to a hearing, and if the complainant proves his equity charges, he has a decree notwithstanding the denial in the answer, and if he cannot produce such proof, the bill is dismissed not for want of jurisdiction, but for want of proof. If, therefore, in this case the complainant has charged no matter in his bill entitling him to relief, and if the defendants in their answers have disclosed none, we admit the bill must be dismissed; but if the charges embrace matter entitling the complainant to relief if true, the case is no doubt completely within the jurisdiction of the court, and the decree must depend upon the proof. As to the evidence of fraud it is contended, that all the circumstances in the case prove, that the conveyances were made by Smith for the purpose of defrauding

his creditors, and were not bona fide as they purported to be. He conveyed away all his estate both real and personal, and threw himself and wife, in their old age, upon the charity of the world. The conveyances were all made to his own children, and very nearly at the same time, and before witnesses who belonged to the family. These conveyances were made at the time suits were pending against Smith. There were no settlements, computations, or receipts, made or given at the time. These, and all the other features of the transaction, clearly demonstrated, that the conveyances were a mere cover to protect these lands from the creditors of Smith. If the court is satisfied, that the transactions were fraudulent, it can afford the plaintiff Bean, ample remedy, by setting aside the fraudulent deeds. 1 Johns. Ch. 478; 2 Johns. 297. It may order the property to be sold to pay the plaintiff. Sands v. Codwise, 4 Johns. 600; 3 Johns. Ch. 481, 507. If the land is sold to bona fide purchasers, the fraudulent grantee is liable for the value. 1 Mod. 260. Deeds fraudulent on the part of the grantor may be set aside, though bona fide as to the grantee. 2 Johns. Ch. 42; 14 Ves. Jr. 289. A bona fide purchaser from a fraudulent grantee, acquires no title by the conveyance, against the creditors of the fraudulent grantor. 3 Johns. Ch. 378; 1 Day, 527.

If the grantor was fraudulent the grantee must suffer the consequences, and is accountable for the rents and profits. Simon Smith, senior, in this case deposited his property in the hands of his children, so that he might be enabled to take the poor debtor's oath. Are they not, therefore, to be considered as trustees for the benefit of his creditors? The fee is in them not to their own use, but in trust for creditors. Equity will order the trust estate to be sold. In this case the court may order the estates conveyed to the children of Smith, to be sold to pay his debts, or may decree against them as trustees personally for the value of the estates and the rents and profits, or order the complainant's debts to be paid.

Whipple, in reply.

It is deemed unnecessary to answer most of the authorities cited. The principles are correct with some exceptions, but their applicability is denied. That a bona fide purchaser for a valuable consideration, should suffer for the fraudulent intentions of the grantor, is so repugnant to common sense, that it is extraordinary, that so great a man as Chancellor Kent, with all his attachment to authority, should, for a moment, have doubted about it. With his usual frankness, however, he corrects himself in 3 Johns. Ch. 378. The only question is, whether the deeds were taken by the grantees bona fide, and with a view to secure themselves, or to aid the grantor in delaying and defrauding creditors. This is a matter of evidence rather than law. That the grantor meant to prefer particular creditors cannot be doubted. That he paid, what he called his private debts, by transferring real estate at from ten to twenty per cent above its value, is fully proved. The residue he chose to give away rather than retain. That he had a right to prefer creditors whose debts originated in hard labor and money advanced, to those who speculated upon his misfortunes, and bought up Gloucester bills at from 60 to 70 per ct. discount, as they themselves prove, cannot be denied. Finch Prec. 105; 1 Fonbl. Eq. 277. The grantor in 1809, owed debts to the amount of $19,540. In payment of those debts he conveyed lands to the value of $13,500. The other conveyances were voluntary.

Can the court order a sale of the land conveyed by deeds of gift? It is difficult to tell, what a court of chancery can or cannot do. All the power which the chancery in England at present possesses has its origin in the decrees of the chancellor, not in the statutes of the realm or the usages of the people. And the boast of their learned writers, that common law is common usage, is just as true, as that the chancellor of England is bound by a fixed and stubborn rule. The power of the chancellor has been increasing from time to time, and every new chancellor establishes new rules in addition, and sometimes in opposition, to old ones, and at this day none but those, whose ardent attachment to the law blinds their better judgment, will contend, that the chancellors of England for the last century, have been bound by any rules but those of their own making. They have none of them as yet established the precedent of selling real estate for the payment of debts, unless by virtue of the contract of the parties. In this country it may be done by the chancellors of those states, the laws of which authorize such a proceeding. The laws of Rhode-Island are opposed to such a sale, and it is submitted with confidence, that the statute of the United States has not conferred the power on this court. General chancery powers are given in all cases, where a remedy may not be had at law. And it follows conclusively, that this court does not possess the power, unless the chancellor of England also does.

It is believed that no case can be found of a voluntary grantee's being made a trustee. It is a case of actual, not constructive fraud, that has called forth such strange decisions. It was formerly thought, that a man could not be made a trustee without his own consent. It has been often decided, that the court of chancery has no power to punish for a fraud, and yet they decide, that a grantee shall be made a trustee, and shall convey to creditors, and in default of complying with the decree, imprisonment follows. This would appear to be punishing a man for a fraud, although it is called punishment for contempt of court. This power in its operation would be very partial and unjust, as it would give to creditors in other states, con-

trol over the real estate of their debtors in Rhode-Island, which Rhode-Island creditors do not possess.

STORY, Circuit Justice. A preliminary objection has been taken to the jurisdiction of the court, upon two grounds, 1. That the plaintiff claims as assignee of a chose in action, on which, independent of such assignment, no suit could be sustained in this court. 2. That there is a complete and adequate remedy at law, and therefore no reason for the interposition of a court of equity.

The suit is between citizens of different states, and plainly within the general jurisdiction of the circuit court, unless it falls within the restrictive clause of the 11th section of the judiciary act of 1789, c. 20, which declares, that the circuit court shall "not have cognizance of any suit to recover the contents of any promissory note, or other chose in action, in favor of an assignee, unless a suit might have been prosecuted in such court to recover the said contents, if no assignment had been made, except in cases of foreign bills of exchange." The bills in which the transactions disclosed in the present case originated, were drawn by a person resident in one state, upon a person resident in another state, and whether they be foreign or inland bills in the sense of the statute, is a question worthy of serious deliberation, upon which much contrariety of opinion has been entertained. As this question has not been argued at the bar, and is not indispensable to a correct decision of this case, I pass it over with the single remark, that I do not wish to be understood as acquiescing in the doctrine, that bills drawn in one state upon drawees living in another state, are to be deemed inland bills. I entertain great doubts as to the correctness of that doctrine, and am not alone in these doubts, and before I come to a decision, I should choose to hear the question fully discussed with all the learning and principles that belong to it.

The present suit is not brought upon any bills of exchange, but at most upon a judgment rendered in favour of the plaintiff against Simon Smith, one of the defendants, upon certain protested bills of exchange, indorsed by Simon Smith, in the state court of Rhode-Island. The chose in action has therefore passed in rem judicatem; and so far as Simon Smith is concerned, is absorbed and extinguished by the judgment. The claim of the plaintiff is not now in virtue of any assignment, but of a direct judgment in his favor; and if the suit were now at law upon the judgment itself, there cannot be a doubt of the jurisdiction of this court to sustain it. In deciding on its jurisdiction, the court can only look to the immediate groundwork of the suit, not to any remote or collateral considerations in which it had its origin. It is no objection to the jurisdiction, that at some anterior period the transaction assumed a shape not within the reach of that jurisdiction. It is sufficient, if it has now become so modified by the act of the parties, or by the principles of law, that jurisdiction now rightfully attaches.

Taking, then, the case in the most favourable view for the argument of the defendants' counsel, it is a suit upon a judgment between citizens of different states, and does not fall within the statute of prohibition. But in truth, the suit is not, strictly speaking, founded solely upon a judgment. The judgment is collateral. It forms an ingredient, and an essential ingredient, in the case; but it is not the whole of the case. The plaintiff seeks for relief against fraudulent conveyances of property, executed by the defendant Simon Smith, to the other co-defendants, for the alleged purpose of defeating the plaintiff of his just rights as a creditor under the judgment. It is these fraudulent conveyances which constitute the immediate ground-work of the suit, and so far as respects all the defendants, except Simon Smith, the sole ground-work of the suit. They were never liable, either upon the original bills or judgment, nor had the plaintiff any claim against them, in his mere character as assignee. If they are liable to him at all, it is because they are parties to a meditated fraud to his injury, or as trustees holding property for his use. His right to sue them, is not a right which once vested in another person, and has passed to him by assignment. It is a right, which originally sprung up after the assignment to him, and from new transactions. And the same observations apply with equal force to Simon Smith. It is not his liability to the plaintiff under the original assignment of the bills of exchange indorsed by Simon Smith, that is now in question, and is now sought to be enforced; but a new right collateral to that, growing out of a direct judgment between the parties, and an asserted fraud injurious to the plaintiff, which has been devised to avoid the satisfaction of that judgment. It is perfectly clear, that the statute never contemplated an exclusion of jurisdiction in cases where a mere negotiable instrument, or chose in action, was mixed up in the ingredients of the case; but where that chose in action constituted the sole cause of action, and the assignment constituted the whole ground of the plaintiff's right. I have no difficulty, therefore, in overruling this objection to the jurisdiction of the court, for the reasons already stated, although the other arguments of the plaintiff's counsel would, in case of any doubt, have been entitled to great consideration.

The other objection is not so much to the competency of the court, as in the nature of a demurrer to the bill for want of equity. Much stress has been laid upon that clause of the judiciary act of 1789, [1 Stat. 82,]

c. 20, § 16, which declares, "that suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law." I take this clause to be merely affirmative of the general doctrine of courts of equity, and in no sense intended to narrow the jurisdiction of such courts. It has been repeatedly held by the supreme court, that the equity jurisdiction of the courts of the United States, does not depend upon what is exercised by courts of equity, or courts of law, in the several states; but depends upon what is a proper subject of equitable relief in courts of equity in England, the great reservoir from which we have extracted our principles of jurisprudence. Robinson v. Campbell, 3 Wheat. [16 U. S.] 212, 221; U. S. v. Howland, 4 Wheat. [17 U. S.] 108, 115. If, therefore, a bill of this sort, states a case properly within the cognizance of courts of equity, according to the general doctrines of their jurisprudence, I should have no difficulty in overruling this objection, although the state courts of Rhode-Island, might afford some sort of remedy at law to aid the plaintiff. There are many cases in which courts of law and equity exercise a concurrent jurisdiction, and the judiciary act never intended to disturb that jurisdiction. In such cases, it is supposed that the remedy at law is not adequate and complete for all the purposes for which the plaintiff may claim relief. Herbert v. Wren, 7 Cranch, [11 U. S.] 370, 376. There cannot be a doubt, that this bill states a case, which is entirely fit and proper, if it be proved, for the interference of a court of equity. Nothing is more common, than for courts of equity, upon bills filed for the purpose, to set aside conveyances made to defraud judgment creditors. It is a case peculiarly belonging to its jurisprudence, and adequate and complete relief cannot be obtained at law. Coop. Eq. Pl. 148; 1 Eq. Cas. Abr. 77, pl. 13; Smithier v. Lewis, 1 Vern. 398; Mountford v. Taylor, 6 Ves. 788; Bennet v. Musgrove, 2 Ves. Sr. 51; 3 Bac. Abr. "Fraud," D; Com. Dig. "Chancery," 3, M; Id. "Covin," B, 2.

But I go yet farther in the case now before the court, and affirm not only that the bill presents a case of equitable jurisdiction; but that under the peculiar laws of Rhode-Island, which do not, except in a few specified cases, make lands liable for debts, there is no remedy, at least no adequate remedy at law; and that if the plaintiff be entitled to any relief, he must seek it exclusively in a court of equity. The case is wholly unlike that to which the supreme court alluded in the language cited at the bar, from Russell v. Clark, 7 Cranch, [11 U. S.] 69, 89. The language there used, supposes that the bill states no case for equitable relief, but only asks for a discovery on which to found equitable relief; and if the answer discloses none, then as neither bill nor answer shews any title to such relief, the parties must be dis-

missed to their remedy at law. Here, the bill does state a case for equitable relief; and though the answers of some of the defendants deny the facts on which that relief is sought, that is a question, not of jurisdiction but of proof. As to some of the parties the bill is confessedly true, for they claim under voluntary deeds of gift, which the law deems fraudulent as to creditors. We may then dismiss any farther consideration of the preliminary questions of jurisdiction, and pass to the merits of the case as they stand disclosed in the pleadings and evidence.

Before, however, proceeding to this discussion, it may be as well to dispose of another point urged at the bar, and which is of vast practical consequence; I mean the doctrine, that a bona fide purchaser for a valuable consideration, without notice, cannot protect the estate in his own hands, against creditors, where he derives his title to the estate through a grantee to whom it was originally conveyed for the purpose of defrauding the creditors of the first grantor. This doctrine is certainly supported by high authority of a recent date, and the cases cited at the bar are fully in point. Until I had perused these cases, I am free to confess, that I was not aware that there was in this respect any difference between the operation of the statute of 13th of Elizabeth, (chapter 5,) which avoids conveyances made in fraud of creditors, and that of the 27th of Elizabeth, (chapter 4,) which avoids conveyances made in fraud of subsequent purchasers. An unbroken current of authorities establishes beyond question, that a bona fide purchaser for a valuable consideration, without notice, shall hold the estate, notwithstanding he claims through a grantee to whom it had been conveyed in fraud of purchasers. 1 Fonbl. Eq. bk. 1, c. 4, § 13, note f, p. 278; Rob. Fraud. Conv. p. 496, c. 4, § 10; Prodgers v. Langham, 1 Sid. 133; Newport's Case, Skin. 423, 3 Lev. 267; Doe v. Martyr, 1 Bos. & P. (N. S.) 332. But Mr. Chancellor Kent has held, in Roberts v. Anderson, 3 Johns. Ch. 371, that the same doctrine does not apply, where there has been a conveyance to defraud creditors. If this be so it is certainly a departure from the general doctrine of courts of equity, on the subject of bona fide purchasers without notice. So solicitous are courts of equity to preserve the rights of persons in this predicament, that Lord Chancellor Loughborough, in Jerrard v. Saunders, 2 Ves. Jr. 454, 458, (Coop. Eq. Pl. 281; and see Bassett v. Nosworthy, Finch, 102; 2 Fonbl. Eq. bk. 3, p. 307, c. 3, § 3,) emphatically declared, that against them the court would not take the least step imaginable. They are not only treated as favourites of courts of equity, but the common law in many instances, holds their titles good, although in the hands of the original grantees, the titles were infected with the taint of fraud, or other analogous infirmity. Com. Dig. "Covin," B; Prodgers v. Langham, 1

Sid. 133; Woodcock's Case, 33 Hen. 6, 14; Shep. Touch. 66; Hob. 166; Bingham's Case, 2 Coke, 91, 94; Gibbs v. Chase, 10 Mass. 125; Jackson v. Henry, 10 Johns. 185; Jackson v. Walsh, 14 Johns. 407; 1 Fonbl. Eq. p. 268, c. 4, § 11, note Y. If, therefore, the doctrine is to stand, it must stand either as an exception founded upon public policy; or upon the positive provisions of the statutes of 13th and 27th of Elizabeth. As to public policy, it remains to be demonstrated that it would be essentially promoted by the alleged exception; at least it does not strike one, that there is any general reasoning on this head, which would not apply with equal force to subsequent purchasers, as well as to creditors. There is the same injustice and mischief in allowing a subsequent purchaser without notice from the fraudulent grantor, to be defeated in his rights by a prior conveyance to a like purchaser from the fraudulent grantee, as in the analogous case affecting creditors. The ground cannot be, that in the former case the conveyance is voluntary, and takes effect between the parties and their representatives, for that is equally true as to conveyances in fraud of creditors. The real ground of the doctrine must be, that where the parties are equally innocent and equally meritorious in their titles, the law will give a preference to that title which has a priority in point of time, upon the maxim "qui prior est in tempore potior est in jure." A conveyance to defraud purchasers, or to defraud creditors, is not "utterly void," as has been sometimes supposed; it conveys the estate effectually as between the parties and their representatives; and the estate may be maintained against all persons but those whom it was intended to defraud. The grantor himself cannot convey the same title to any mere volunteer, nor can he avoid his own grant in his own favour; nor can a mere stranger contest the validity of the conveyance. Rob. Fraud. Conv. p. 498, c. 4, § 10; Dame Burg's Case, Moore, 602; Fonbl. Eq. bk. 1, p. 273, c. 4, § 12, note. The estate, therefore passes toties quoties by every subsequent conveyance, and it is good against all the world, except creditors and purchasers, in the possession of every successive grantee, even with notice of the fraud. Mr. Chancellor Kent says (Roberts v. Anderson, 3 Johns. Ch. 371, 378) that "if the fraudulent grantee be enabled to sell, the grantor cannot call those proceeds out of his hands." This is very true; but neither can he recall the land itself, or avoid his own grant. He adds, "and the grantee can either appropriate them to his own use, or to the secret trusts upon which the conveyance was made." And he thence deduces the conclusion, that "there is more danger of abuse, and that the object of the statute could be more easily defeated in the one case (i. e. of creditors) than in the other," (i. e. of purchasers). It may be asked of that eminent judge, whether the doctrine, here asserted, be correct? Is it true, that the grantee can appropriate the proceeds of a sale to his own use, or to the secret trusts of the fraudulent conveyance against a judgment creditor? Will not a court of equity decree, that the fraudulent grantee shall account to the judgment creditor for the amount of the proceeds of the sale, considering them as a mere substitution for the original fund? It appears to me, that such a course is within the established doctrine and practice of the court. Equity will permit a creditor of an estate to sue the debtor, where there is collusion between the latter and the executor. Benfield v. Solomons, 9 Ves. 77, 86; Alsager v. Rowley, 6 Ves. 748; Doran v. Simpson, 4 Ves. 651. A fortiori it will sustain a suit where the very fund appropriated by law for the payment of the debt, is withheld by a fraudulent grantee. See Hendricks v. Robinson, 2 Johns. Ch. 283; and see Rob. Fraud. Conv. p. 502, c. 4, § 10; Gore v. Brazier, 3 Mass. 541; 3 Poth. Pand. lib. 42, p. 195, tit. 8, art. 3, § 24. If, then, the reasoning of the learned judge on this point, proceeds upon principles which are inadmissible, the conclusion drawn from those principles, may well be doubted. No peculiar principle of public policy has been shewn to exist in respect to creditors, which entitles them to a preference over other bona fide purchasers. They stand in truth in the character of purchasers for a valuable consideration, and not above them. The analogies of the law do not support any peculiar distinction in their favour. The policy of the law generally, is to support bona fide purchasers for a valuable consideration in the titles acquired; and this policy is at least as ancient as Woodcock's Case, in 33 Hen. VI. 14, where a conveyance from a fraudulent grantee to such a purchaser, was permitted to defeat highly meritorious and legal claims. The great object of the law is to afford certainty and repose to titles honestly acquired. It is of no public utility to destroy titles so acquired, on account of the taint of a prior secret fraud, which was unsuspected and unknown, and which probably no diligence could detect. If the creditor of the original grantor be cheated by holding such titles valid, the innocent purchaser would be no less cheated by holding them void. And, therefore, the common law which leans to equity, is unwilling to visit upon innocent persons, the consequences of fraud. It enables them to hold estates acquired bona fide for a valuable consideration, purged of the anterior fraud that infected the title.

Then as to the statutes of 13th and 27th of Elizabeth. In their most material provisions, they have, in modern times, been held as merely affirmative of the common law, (Cadogan v. Kennett, Cowp. 432, 434; Sands v. Codwise, 4 Johns. 536, 596; Hamilton v. Russel, 1 Cranch, [5 U. S.] 316;) and one should cautiously put upon them any construction, which implies a departure from that law. In the only case, where such a

departure under the 27th of Elizabeth, has been tolerated, I mean in respect to the rights of a subsequent purchaser with notice, to set aside a voluntary conveyance, courts and jurists in modern times, have felt the difficulty of sustaining that doctrine upon any sound principles, where the voluntary conveyance is not a meditated fraud; and if the point were new, it would be, I had almost said, immoral to adopt it. It stands drily upon authority, and we bow to it neither with reverence nor affection. The statute of 13th of Elizabeth (chapter 5,) in the first section, declares, that all and every feoffment, gift, grant, alienation, bargain, and conveyance of lands, &c. goods, &c. made with intent to delay, hinder, or defraud creditors and others, of their just actions, suits, debts, &c. "shall be from henceforth deemed and taken only as against that person or persons, his or their heirs, &c. executors, &c. whose actions, suits, debts, &c. by such guileful, covinous, or fraudulent devices and practices as aforesaid, are, or shall, or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void, frustrate, and of none effect." The sixth section of the same statute, contains a proviso, that "this act, or any thing therein contained, shall not extend to any estate or interest in lands, &c. goods, &c. had, made, conveyed, or assured, or thereafter to be had, made, conveyed, or assured, which estate or interest is, or shall be, upon good consideration, and bona fide lawfully conveyed or assured to any person or persons, or bodies politic or incorporate, not having, at the time of such conveyance or assurance to them made, any manner of notice or knowledge of such covin, fraud, or collusion, as is aforesaid." It is observable, that this proviso does not use the expression, feoffment, gift, or grant, &c. but estate and interest, and that there is not a syllable in it, which points to any estate or interest derived directly from the fraudulent grantor, any more than from the fraudulent grantee. The language in its just interpretation, applies equally well to an estate derived from either. And it would be somewhat strange, if it were intended merely to apply to an estate or interest derived from the grantor. In the first place, if such estate or interest was before the fraudulent conveyance, it is manifest, that it could not be affected by it, in any manner whatsoever. In the next place, if it were after such conveyance, then by excepting such cases from the operation of the act, it would leave such estate or interest, exactly where the act found it, to be judged of according to the rules of the common law. And if the common law would give effect to such second grant as against creditors, (as would probably now be held) then the creditors would be just as much defrauded, as they would be by a second grant of the grantee, being held valid. For if the second grant of the grantor could convey a good title directly, and purged

of the fraud, the public mischief would be quite as great, as if he conveyed indirectly through the medium of his fraudulent grantee. If, on the other hand, as it seems to be thought, the old law stood, (see Halsey's Case, Lane, 105; Upton v. Basset, Cro. Eliz. 445,) the second grant from the grantor could not avoid the first grant, then there would be still less reason to suppose, that the proviso meant to save only an estate or interest derived from the grantor, which the law held utterly defective and inoperative. There seems, then, no reason founded on the intent of the statute, why the language should be held less comprehensive in its operation than the terms import.

Then, as to the statute of 27th Elizabeth, c. 4. The first section declares all and every conveyance, gifts, grants, &c. of lands, &c. made for the intent to defraud and deceive such person or persons, &c. as have purchased, or shall thereafter purchase, in fee simple, &c. the same lands, &c. "shall be deemed and taken only as against that person or persons, &c. his and their heirs, &c. and against all and every other person and persons, lawfully having or claiming by, from, or under them, or any of them, which shall have purchased or shall thereafter so purchase for money, or other good consideration, the same lands, &c. to be utterly void, frustrate, and of none effect." Then comes a proviso in the 4th section, "that this act or any thing therein contained, shall not extend, or be construed to impeach, defeat, make void, or frustrate, any conveyance, &c. assurance, grant, &c. estate, interest, &c. of any lands, &c. heretofore at any time had or made, or hereafter to be had or made, upon or for good consideration, and bona fide to any person or persons, &c." And another proviso in the sixth section extends the same protection to every "lawful mortgage made or to be made bona fide, and without fraud or covin upon good consideration." Now it is observable, that these enactments are substantially like those of the 13th of Elizabeth, as to their objects. In each, the fraudulent conveyance is declared "utterly void," as to the persons intended to be defrauded, and is limited to those persons. In each, there is an exception of estates acquired bona fide, and upon good consideration; and the only marked difference of language is, that the proviso of the 27th of Elizabeth, drops the expression of the 13th of Elizabeth, as to notice of the fraud by such purchaser. In the proviso of the 27th of Elizabeth, there is no qualification or limitation as to the person, from whom the conveyance or estate is acquired; and it has been always held to apply equally to estates derived from the fraudulent grantor and grantee. And this, not upon any necessary construction of the statute, but upon the principles of the common law. Prodgers v. Langham, 1 Sid. 133, is a leading authority on this head. There the court agreed, that though a deed

might be fraudulent in its creation, and voidable by the purchaser, yet it might be made good by matter ex post facto; as if one made a feoffment by covin, and the feoffee makes a feoffment for a valuable consideration, and then the first feoffor enters and makes a feoffment for a valuable consideration, the feoffee of the first feoffee shall hold the land, and not the feoffee of the first feoffor. The reason assigned by the court is, not that such is the construction of the language of the statute, forcing them to such a conclusion, but that such is the common law; for, say the court, though the estate of the first feoffee was in its creation, "covinous and so voidable; yet when he enfeoffs upon a valuable consideration, this shall be preferred before the last." Precisely the same reasoning applies to the case of creditors, under the 13th of Elizabeth. The estate is not utterly void as to all persons; but voidable, and voidable by creditors only; and a bona fide transfer by the grantee ought to convey the estate purged of the fraud.

I repeat it, that until I saw the case of Roberts v. Anderson, 3 Johns. Ch. 371, which professes, in no small degree, to be founded upon that of Preston v. Crofut. 1 Day, 527, note, the asserted distinction which we have been considering, between the operation of the statute of 13th Elizabeth, and that of 27th Elizabeth, was utterly unknown to me. I have searched with some diligence, to ascertain if that distinction has been recognized in any adjudged case, or in any elementary treatise in England. Hitherto my researches have been unsuccessful. In Wilson v. Wormal, Godb. 161, however, Lord Chief Justice Coke, than whom no man was probably better acquainted with the statute, or its true construction, lays down the doctrine that in terms denies the distinction. He says, that "if lessee for years assign over his term by fraud to defeat the execution (upon a judgment against him); and the assignee assigneth the same over unto another bona fide, that in the hands of the second assignee, it is not liable to execution." In Gore v. Brazier, 3 Mass. 523, 541, Chief Justice Parsons manifestly understood the law in the same way. He says, "a bona fide alienation for a valuable consideration by a devisee, has been compared by the counsel for the defendant to a case, where a fraudulent purchaser has afterwards bona fide, and for a valuable consideration conveyed, in which case the last purchaser shall hold the land purged of the fraud. But the two cases are not alike in principle, for the consideration money received by the devisee, cannot be personal assets in the hands of the executor." The like doctrine is directly asserted by the supreme court of Massachusetts, in a recent case, (Inhabitants of Worcester v. Eaton, 11 Mass. 368, 378; Trull v. Bigelow, 16 Mass. 406;) and I may be justified in asserting, that such has been in that state the received law of the land. The reasoning of the court

in Jackson v. Henry, 10 Johns. 185, and Jackson v. Walsh, 14 Johns. 407, would have strongly led to the same conclusion, illustrated as the doctrine there is, in analogous cases. In the latter case, the doctrine is broadly laid down, that "it has been a long and well settled principle that a purchaser for a valuable consideration, without notice, has a good title, though he purchase of one, who had obtained the conveyance by fraud."

There is, too, the light of the civil law to guide our inquiries on this subject. The learned author of the treatise of equity has justly observed, that "by the civil law, whatever debtors do to defeat their creditors is void; and there is a great resemblance between the civil law in this matter, and the statute of 13th Elizabeth: But in each of them, there was this exception, that it should not extend to avoid any estate or interest made upon good consideration, and bona fide." 1 Fonbl. Eq. b. 1, p. 270, c. 4, § 12. And the learned author is well warranted in his assertion; and his reference to the civil law, where the very case now under discussion is put, shews, that he did not contemplate the existence of the present distinction. The case put in the Digest is, "Is qui a debitore, cujus bona possessa sunt, sciens rem emit, iterum alii bona fide ementi vendidit. Quae situm est an secundus emptor conveniri potest? Sed verior est Sabini sententia, bona fide emptorem non teneri; quia dolus ei dumtaxat nocere debeat qui eum admissit. Quemadmodum diximus non teneri eum, si ab ipso debitore ignorans emerit. Is autem qui dolo malo emit, bona fide antem ementi vendidit, in solidum pretium rei quod accepit tenebitur." 3 Poth. Pand. lib. 42, tit. 8, p. 195, art. 3, § 25. I trust that the doctrine of this latter clause is equally the doctrine of courts of equity with that, which is so persuasively stated in the former. And the like doctrine is recognized by Voet in his commentaries. 2 Voet Com. lib. 42, p. 822, tit. 8, § 10.

The case has thus far been reasoned upon, as though it depended entirely on the statutes of Elizabeth; but in truth it turns upon the statute of frauds of Rhode-Island. If any doubt could rest upon the proposition, that both these statutes should receive the same construction, that doubt would vanish upon an examination of the Rhode-Island act; for that in the same enacting clause embraces both descriptions of persons, creditors and purchasers, and as to them avoids all fraudulent conveyances, and contains no proviso of any sort. St. R. I. 1798, p. 473, § 2. The case of a bona fide purchaser must, under this statute, stand purely upon the principles of the common law.

The great deference, which I feel for the chancellor of New-York, and the supreme court of Connecticut, has occasioned no small solicitude on my part respecting this subject. I have weighed the reasoning, which has directed their judgment with care; and, how-

ever reluctantly, I am constrained to declare, that it does not carry conviction to my judgment. I cannot persuade myself to desert the doctrine of Lord Coke, and the civil law, fortified as it is by the general analogies of the common law. If, therefore, it becomes material to the parties in this cause to establish the doctrine, that a bona fide purchase for a valuable consideration without notice, derived under a grant made to defraud creditors, is not a good title against creditors, I shall decide against the proposition, and leave the parties to their appeal to the supreme court.

There is another objection lying at the very foundation of this bill, which requires deliberate consideration. It is this. By the laws of Rhode-Island real estate is not subject to be taken in execution by a judgment creditor, except in a few cases specified in the statutes of that state. Where the debtor is alive and resides within the state, the laws do not authorize an attachment or levy upon his real estate, unless he conceals himself, so that neither his body nor personal estate can be come at to satisfy his debts. St. R. I. 1798, p. 202, § 5. The present case does not (as it is said) fall exactly within this description, and it is hence inferred, that however fraudulent may have been the conveyances sought to be set aside by the bill, the plaintiff is without remedy, since he had no lien on the real estate, and could not acquire any title to it by his judgment. If conveyances are acknowledgedly made in fraud of creditors, and in cases, circumstanced like the present, a judgment creditor can have no redress either at law or in equity, the jurisprudence of the country is most shamefully defective in the first principles of justice. Men must rely altogether upon the private honesty of their debtors for payment of their debts and not upon remedies by the law. A dishonest debtor may lock up a splendid fortune from the reach of his creditors, and by the facile contrivance of a conveyance to defraud his creditors secretly secure to himself or his family the whole profits of his corrupt conduct; and, if he can quiet his conscience, relieve himself afterwards from imprisonment under the plausible character of a poor prisoner. I am, however, of opinion, that the justice of the country does not deserve such a reproach. Here is a case, where the judgment creditor took the body of his debtor in execution, and had a right to retain him in imprisonment, unless he could discharge himself by taking the poor prisoner's oath, that he had no property to support himself in prison or to pay prison charges, and that he had not conveyed any part of his estate to any persons with intent to secure the same, or to defraud his creditors. The laws of Rhode-Island contemplate, that a false oath taken by the prisoner on such an occasion incurs the penalty of perjury. St. R. I. 1798, pp. 229, 231. If, then, the debtor cannot, while he possesses prop-

erty, be relieved from imprisonment, but his body is security for the debt; and he makes a fraudulent conveyance of his property, (the natural fund for the payment of that debt) for the express purpose of cheating his creditors, and depriving them of every means of satisfaction, it cannot be possible, that the law will authorise the party or his coadjutors in such conduct to reap the fruits of their dishonesty. If the property be not directly subjected to the judgment, it is indirectly liable, since the debtor can never be entitled to a discharge, without yielding it up to his creditors. And if the debtor does procure a fraudulent discharge of his person by a fraudulent transfer of that property, the law will hold the latter a substitute for the former by his own consent. It is by no means universally true, that, because there is no lien directly created on land or other property by a debt or decree in favour of a creditor, therefore he can never be entitled to any relief in respect to them. Herne v. Meeres, 1 Vern. 465. He may acquire it by the conduct of the debtor himself. A sequestration upon a decree in chancery is only personal process, and does not affect the land immediately like an extent or a judgment. The contempt in not performing a decree is the foundation for a sequestration, for the decree acts only in personam, and not in rem. Bligh v. Darnley, 2 P. Wms. 620, 621. And yet a conveyance made in fraud of a decree or of a sequestration will be set aside in equity. Self v. Madox, 1 Vern. 460, and cases cited; Simmonds v. Kinnaird, 4 Ves. 735; Colston v. Gardner, 2 Ch. Cas. 43; 1 Har. Ch. Pr. p. 142, c. 26. If the debtor, with the intent to defeat a particular judgment creditor, lend his money, this, though a mere chose in action, and on which the judgment did not attach as a lien, may yet be followed in equity by the creditor. Smithier v. Lewis, 1 Vern. 398; and see 1 Eq. Cas. Abr. 132, pl. 15. I know, that there are cases, in which equity has refused to interfere to follow personal property into the hands of a fraudulent grantee, unless execution was first taken out, which should bind that property. But this is not universally true, any more than the rule requiring, as to lands, the suing of an elegit. Angell v. Draper, 1 Vern. 399, and Raithby's note 1; and 1 Vern. 463. In the case of collusion between an executor and a purchaser of leasehold assets, a creditor on a bond debt was permitted to reach the purchase money in the hands of the purchaser, and in default of payment the leasehold estate was decreed to be sold, and payment ordered out of the proceeds of the sale. Crane v. Drake, 2 Vern. 616, Raithby's note 1. See Hendricks v. Robinson, 2 Johns. Ch. 283. It is far from being necessary in all cases, that it should appear, that a creditor will sustain a loss unless a fraudulent conveyance be set aside. In Chamley v. Lord Dunsany, 2 Schoales & L. 690, 714, Lord Eldon in the house of lords declared, "it is

every day's practice for a creditor, a puisne creditor, to have a conveyance of his debtor's estate declared fraudulent; and although the purchaser says, that there is sufficient to pay the creditor, still the plaintiff is not delayed for an inquiry into that effect; and if the conveyance is proved fraudulent, or a trust, the court declares it so, though it is plain, that the grantor may be benefitted much more than the plaintiff." But where there is a real injury to the creditor, where he does sustain a loss by the fraudulent conveyance, it would be a narrow obedience to mere technical rules to deny him relief. He must have a right to come into chancery and have the fraudulent conveyance set aside; and if the court be bound to go thus far, there is no reason, why it should not stretch out its arms to give him complete redress.

The principle is not new, that a party, who obtains an estate in fraud of the rights of another, shall be held the trustee of him, whom he has defrauded. The doctrine has been applied even to those, who claim as innocent parties, where it is directly through the fraud without any intervening acts or considerations of their own; for it is against conscience, that one person should hold a benefit derived through the fraud of another. Huguenin v. Baseley, 14 Ves. 273, 290. And the fraudulent procurement of the omission of an act has been visited upon the party with the same effects, as if the act had been done. Id., and cases there cited; Mestaer v. Gillespie, 11 Ves. 621, 638. It is familiar, that a person procuring a perfect legal title of property with notice of a prior title derived under the same party, and not yet perfected, shall be held a trustee of the prior purchaser, and compelled to surrender his own title. That is the common case of a second purchaser having knowledge of a prior unrecorded deed. The doctrine is carried yet further, so that a party enabling another to commit a fraud is made answerable for the consequences, either personally or in his estate, as the case requires. Evans v. Bicknell, 6 Ves. 174.

It appears to me that a court of equity may justly consider the grantees in this case, supposing the charges in the bill to be true, as holding the property conveyed to them in trust for the benefit of the judgment creditors, who have been defrauded by the conveyances. If the precedent were to be made for the first time, I should have no difficulty in holding this doctrine upon the eternal principles of justice and morality. The debtor, who conveys his property for the purpose of defrauding his creditors, and upon the ground, that he has no property, procures a discharge of his person, (that pledge, which the law had given them for their debt,) ought to be estopped from denying, that the property so conveyed stands bound for his debts, and that the person, in whose hands it is deposited, holds it in trust for this purpose. If the justice of the case could not be reached by this course, I should have as little difficulty

in holding, that a fraudulent purchaser should be held to account to the creditors for the full value of the property without any allowance for any of the purchase money paid by him, upon the ground that such payment being fraudulent is void as to the creditors; and that the case would be the same, as if the whole purchase money still remained in his hands unpaid. In this latter case, there could be no doubt of the fitness of a remedy in equity in Rhode-Island; for certainly personal estate (and such would be the purchase money) is completely bound by a judgment and execution. By the civil law fraud may also create obligations, where there is no direct agreement. For if debtors pass away their goods or estates to defraud creditors, it is declared by that law, that he that receives them shall be forced to return them to the creditors. Woods, Ins. Civ. Law, bk. 3, p. 248, c. 6, § 8. If such doctrines be new here, they are not elsewhere; and they are so consonant with reason, with equity, and with conscience, that little effort can be necessary to persuade us to adopt them.

We have now discussed the principal questions of law applicable to this case, and may well return to a consideration of the facts. And the material question here is, whether the conveyances by Simon Smith to the other respondents are, as charged in the bill, fraudulent. It appears, that the plaintiff was on the 22d of December, 1808, the holder of certain bills of the Farmers' Exchange Bank, of which Simon Smith was a director; that he received in payment of those bills two drafts drawn on one Andrew Dexter by the cashier of the bank, in favour of Smith, and indorsed by Smith, and also by the president of the bank in blank, one for $3,063, and another for $1,500. These drafts being dishonored, the plaintiff afterwards on the 15th of March, 1809, brought two actions on the same drafts against Simon Smith in the state court of Rhode-Island, and at the March term, 1810, of the supreme court of that state recovered judgment in the same actions to the amount of $5,095, 34-100 damages, and $57.03 costs. Executions duly issued on these judgments, on which Simon Smith was committed to gaol in May, 1810, and afterwards on the 10th of May, 1813, he was discharged from gaol on taking the poor prisoner's oath according to the laws of Rhode-Island. That oath, as has been already stated, supposes the party to be utterly without property sufficient to support himself in prison, or to pay prison charges; and he is expressly required to swear, that he has not, directly or indirectly, sold, conveyed, or disposed of, or entrusted any person with any of his estate, real or personal, to defraud his creditors or to receive any profit for himself.

During the pendency of the plaintiff's suits, and before judgment, Simon Smith being then in possession of a very valuable real estate, by his own confession worth $12,000

or $14,000, conveyed the whole of his real and personal estate, including his household furniture, to his children, thus stripping himself at once of all his property and means of support. The material facts are as follows: On the 15th of September, 1809, Simon Smith, for the asserted consideration of $1,000, leased to his two sons-in-law, William Foster, (one of the respondents) and William Steere, (a respondent by the bill, but who died pending the suit, and it has not been revived against his representatives) for five years from the first day of April, 1810, two farms, one called the Wells farm of about 218 acres, and another called the Rounds farm of about 120 acres. On the same day he conveyed the reversion of the same farms in fee to his daughters Esther the wife of the said William Steere, and Elizabeth the wife of the said William Foster, for the asserted consideration of love, good will, and parental affection. The deeds are admitted to have been executed at the same time; and the respondents allege, that the consideration money of $1,000, was first secured and afterwards actually paid by them to one Zephaniah Andrews, to whom Simon Smith was indebted, and credited to his account. The testimony of the plaintiff's witnesses establishes, that these farms were at the time worth from $6,000, to $7,000. On the same 15th day of September, 1809, Simon Smith executed a lease for 10 years, of a lot of land called the Waterman lot, containing about 54 acres, to his son Ziba Smith, (one of the respondents) for the asserted consideration of $738, and on the same day conveyed the reversion of the same lot in fee simple to his said son for the asserted consideration of love, good will, and affection. Three days afterwards Simon Smith conveyed to the same son a lot of woodland, containing about 26 acres, for the like consideration of love, good will, and parental affection. The respondent Ziba Smith alleges, that upon these conveyances he paid about $1,800, and as part of this sum he gave his note, which he afterwards paid, to Zephaniah Andrews, for $1,500, on account of his father's debt. The plaintiff's witnesses establish the value of the Waterman lot to be about $1,350. The value of the wood lot does not appear; but was probably worth quite $800 or $1,000. On the same 15th of September, 1809, Simon Smith executed a lease to his son Darius, for five years from the ensuing April, of a farm called the Daniel Eddy farm, containing about 130 acres, for the asserted consideration of $500. Three days afterwards Simon Smith conveyed the reversion of the same farm for the asserted consideration of $500, to his sons Darius Smith and Ahab Smith, and "to the eldest male heir of each of them, and their eldest male heirs, and so to descend in that line in equal moieties." Darius died in March, 1816, insolvent, and on the 7th of February of the same year, Ahab and Darius (Thomas,

the oldest son of Darius, joining in the deed) conveyed the same property to their nephews Amasa Steere and William Steere, Jrs., (the sons of William Steere, the respondent) for the asserted consideration of $2,000, and a lease was granted by them back to Ahab, of the premises, for and during his Ahab's life. The lease was executed on the same day, and purports to have been given in consideration of their uncle Ahab's having the same day executed a deed of gift to them of his estate in the same land, and for the further consideration of one dollar. It may not be unimportant to observe, that the execution of these deeds is witnessed by Simon Smith and William Steere, and that there is an express reference in the first deed to the title of the grantors, as derived under Simon Smith's deed of the 15th of September, 1809. The respondent Ahab alleges that his father was indebted to him, in the sum of $3,040,99, (a specific return of the items of which, under date of 1815 and 1816, is annexed to the answer) of which about one half is for services, and the other half is made up of items of a miscellaneous character, of which one item of $875, is sufficiently remarkable, it being the estimated rent of the Daniel Eddy farm, from the time of the original purchase by the father, to the time of the conveyance. This is claimed on the ground, that the father bought the farm originally for his sons in payment of their services; and the amount constitutes the payment made by Ahab to his father, for his moiety. The Messrs. Steere in their answer allege, that the $2,000 mentioned in the deed to them, was paid to Darius partly by the payment, with the assistance of their father, of debts due by Darius to his creditors, to the amount of $1,060, and partly by payment of a mortgage of Darius to a Mr. Barton, in January, 1816, for $300, and for the residue of $640, they gave their note to Darius, which since his death has been paid to his creditors. As the plaintiff seeks only to subject to his claim the moiety of Ahab, so far as his life estate extends, it is not necessary to consider how that of Darius is sustained. It is clear, that as the young Messrs. Steere claim through a voluntary gift of Ahab, by the very terms of their deed, they cannot be permitted to set up, as they now pretend, a different pecuniary consideration, (Bridgman v. Green, 2 Ves. Sr. 627; Clarkson v. Hanway, 2 P. Wms. 203; Watt v. Grove, 2 Schoales & L. 492, 501; Hildreth v. Sands, 2 Johns. Ch. 35, 42;) and they must be deemed as mere volunteers standing in the same predicament as if the estate were now in Ahab. But as they are not parties to this bill, and that of Dexter v. Smith, [Case No. 3,866,] and others, applies to them, I shall reserve all farther remarks for that case.

It is deserving of observation, too, in this connexion, that Simon Smith by a deed purporting to be dated on the 7th of March, 1807,

but not acknowledged until 7th of March, 1808, in consideration of love, good will, and parental affection, conveyed to the same Darius Smith, "and to his eldest male born heir born unto him, and to his eldest male heir, and so to descend down to the eldest male heir, &c." a farm called the Lewis and Tinkham farm, containing about 93 acres. And yet the consideration set up to support the other deed in favour of Darius, is founded in a great measure upon services, which were unrequited by his father. On the 22d of November, 1809, Simon Smith, for the asserted consideration of $8,000, conveyed to his sons Ziba Smith and Simon Smith, Jr., (the respondent) in fee, his homestead farm, containing about 300 acres. Afterwards on the 30th of May, 1812, Ziba Smith conveyed his moiety of the farm excepting 31 acres, to Simon Smith, Jr., for the asserted consideration of $4,000, and thus Simon became possessed of the whole farm, with the above exception; and Simon Smith, Jr., on the same day conveyed his moiety of the 31 acres to Ziba Smith, for the asserted consideration of $784. Simon Smith, Jr., further admits, that he received at the same time all the personal estate that there was of his father's, consisting principally of household furniture worth about $200, and paid for the same. He does not, however, upon his original answer state the manner in which he paid, either for the personal or real estate so conveyed to him; and exceptions having been taken to it on this account, by his supplemental answer, he asserts, that on the first of October, 1809, he paid Zephaniah Andrews, on his father's account, $1,250; that on the 1st of August, 1809, he became bound to one Seth Hunt, for his father, (as it should seem) for the sum of $2,273,80 which he afterwards in July, 1810, paid. He paid to other creditors about $909,33; and he held notes against his father amounting to $595,72. Some of these notes were given to him in 1805, some in 1806, one in 1808, and one in 1809. He further states, that in 1805 or 1806, he assisted his father in building a vessel called the "Perseverance," and for this and other previous services, his father agreed to allow him one moiety of the price for which she should be sold; and that she was sold, as he believes, for about $6,000. That he took one moiety of the farm above mentioned in payment of the debts due to him; and that he and his brother Ziba gave their father their several notes for $4,000 each, for the purchase money, and that what was due him beyond the price of his moiety of the purchase money, was to be paid by Ziba's note. That Ziba afterwards being embarrassed, and unable to pay the note, he took the conveyance of the moiety of Ziba in 1812, in payment of the debt due to himself from his father; and about this time, (1812) he took up his own note given to his father, and made a settlement with him, and in that settlement $3,000 was allowed him on account

of the sale of the Perseverance. He adds, that he has paid other sums for his father, but cannot recollect particulars, and is positive in this manner, that he paid $8,000 for the homestead farm; and that in 1810 and 1811, he was obliged to sell some of his own lands to the amount of $2,000, or $2,100, to pay debts contracted on his father's account. The answer of Ziba only states the purchase of his father, and his conveyance to his brother, for the reasons stated by him, and that thus his note given to his father was discharged. He says nothing as to the 31 acres retained by him, not even mentioning the fact of the retainer.

It is material to state, that previous to this fraud, on the 15th day of May, 1807, Simon Smith for the asserted consideration of $1,000, "and other good considerations him thereunto moving," executed a lease to his son Simon Smith, Jr., and "to his eldest male heir, and to the eldest male heir of him, and so to descend, &c." for a term of 1000 years, a farm called the Absalona Hill farm, containing about 335 acres. On the same day he conveyed to his said son in fee, another tract of land containing about 40 acres, for the asserted consideration of $2,000; and also by a third deed on the same day he conveyed to him another tract of land in fee of 25 acres, for the asserted consideration of $1,000. These three deeds being all executed at the same time between the same parties, must be considered as one transaction; and they convey about 400 acres of land for $4,000, worth, as one of the witnesses declares, from $12,000 to $15,000. It is apparent, therefore, that paternal love and affection must have constituted a material inducement to the conveyance. In respect to his son Ziba, too, there is no reason to suspect the father's want of liberality, for on the 12th of April, 1800, in consideration of $1,500, and "more especially for the good settlement, well being, and advancement of Ziba in this world," the father executed to him and his heirs male, a lease of three farms, containing about 380 acres, for the term of 1000 years. It may deserve a passing observation, that if, as the respondents now contend, the father was a man who had long been heavily oppressed with debts, and reputed much richer than he really was, and in truth having but little property beyond his debts, it seems somewhat extraordinary, that he should have been so very liberal to his children; and it would require more faith than I profess to have, to believe, that these prior conveyances did not meditate an evasion of the rights of creditors. No man has a right to be generous at the expense of his honest creditors.

We have now passed in review all the conveyances which were made during the pendency of the plaintiff's suit, with a few explanations of the character which is attempted by the respondents to be impressed on them. To these deeds with a single excep-

tion, some one of his children were witnesses, and among these witnesses were Darius Smith, Simon Smith, Jr., William Foster, William Steere, and Elizabeth Foster. The money considerations apparent on the face of these deeds, exceeds $15,000; and if the testimony of witnesses is to be believed, the property was at least worth $22,000. Connecting this with the conveyances previously made, the children were possessed of property derived from their father, worth at least $35,000. Some additional facts ought not to be omitted. Notwithstanding the great diligence exercised in this case, to obtain testimony in support of these conveyances, it does not appear, that Simon Smith at the time was indebted in any considerable amount, excluding the debts set up by his children, but to Zephaniah Andrews, to whom he was indebted not exceeding $4,500, and a debt due to the Farmers' Exchange Bank, of $15,284. The debt due to Andrews appears to have been discharged ultimately by the children of Simon Smith at various times between December, 1810, and May, 1813. Notes were given in small sums, payable in one, two, three, and four years, some of which were signed by the children only; and some were indorsed or signed by the father; and on all, excepting two or three notes of about $1,000, no payments were ever made except after suit and judgment at law against the parties. The debt due to the Farmers' Exchange Bank was paid between May and August, 1809, by bills of that bank, (which had failed in the preceding February) bought at a very great discount, and as seems admitted by the respondents' counsel, for a sum not exceeding $3,000; and from the other evidence in the case, probably for a sum considerably less. The greater part, if not the whole, was purchased for Simon Smith by a Mr. Hunt, who received for the bills two notes, one for $1,500, and one for $773.80, signed by Smith, and indorsed by his sons William Foster, and Simon Smith, Jr. These notes were afterwards sued by the holders, and judgment recovered against the indorsers in the summer of 1810. So that it is apparent, that neither of these debts were in fact discharged by the children at the time of the conveyances above stated; and that the father was not entirely exonerated from them; but as to a considerable part still remained liable as a party to the notes.

Upon the first blush of these transactions, it seems almost impossible not to pronounce the conveyances executed in September and November, 1809, as fraudulent; and made with the meditated design to injure and defeat creditors. The badges of fraud cluster about them in every direction. They were made pending suits brought for large sums of money due to creditors, after the failure of the bank, whose credit Simon Smith had lent his own personal security to support. They were all made to the children of Simon Smith, who appear to have been privies to all the conveyances. The consideration of several of the deeds is avowedly an inadequate consideration as against creditors, founded on mere love and affection;* and the property disposed of in this manner is of great value. The conveyances embrace the whole property, personal and real of the father; thus reducing him to absolute beggary, and including even his household furniture. No money was paid at the time, all rested in confidence, and the utmost that the children ever became bound to pay to creditors, or ever did pay, was short of $7,000, though the property then conveyed to them, was in their own view worth more than double that amount; and beyond all question, upon the evidence, more than three times that amount. The remaining consideration for this property, was either love or affection or debts due, unliquidated debts due for services, from a father who had previously conveyed to the parties large and valuable farms, either confessedly or implicitly from parental affection, or for a very inadequate consideration. It is utterly impossible for a court of justice to sustain such conveyances as bona fide, unless it surrenders all judgment and discretion. The transactions can be viewed in no other light than that, which the father avowed to one of the witnesses who wrote several of the conveyances, as having no other objects but to give his estate to his children. The inference deducible from the facts, that this was the father's whole property, that the conveyances are professedly in part voluntary, and that he was then indebted beyond the amount of his whole estate would alone be conclusive of the fraud. And if fraud applied to any of these transactions, it infected the whole. In a legal point of view, the mala fides which justly applies to one, infects by its contamination the whole. I have no doubt, that they must be declared fraudulent upon this broad and general examination of the case; and if there were any doubt here, a more thorough and minute sifting of the facts accompanying each conveyance, and the answers made in their support, would irresistibly lead to the same conclusion. I forbear, however, to dwell on these facts, as I cannot escape from that which stands so prominent on the face of the transactions. I have omitted to take any notice of the exception to the competency of Thomas Smith and Amasa Steere as witnesses, not because I am against that exception; but because it is not necessary to decide it. See Roberts v. Anderson, 3 Johns. Ch. 371, 375.

Taking this, then, to be the state of the case, for the reasons that have been already suggested, there do not appear to me to be any persons standing before the court as bona fide purchasers for a valuable consideration without notice, and consequently none entitled to protection as such. The next question that arises is, whether the con-

veyances are to stand as securities for the sums which have been really advanced or paid by them for their father since the execution of these instruments. I agree to the doctrine laid down by Mr. Chancellor Kent, in Boyd v. Dunlap, 1 Johns. Ch. 478, and Sands v. Codwise, 4 Johns. 536, 549, that a deed fraudulent in fact is absolutely void, and is not permitted to stand as a security for any purpose of reimbursement or indemnity; but it is otherwise with a deed obtained under suspicious or inequitable circumstances, or which is only constructively fraudulent. At law, where a conveyance is found to be fraudulent, against a creditor, he comes in and avoids all without re-payment of any consideration. But it is said, equity can deal differently with it, and decree back principal and interest; and, therefore, in equity a lesser matter will in such a case set a conveyance aside. Herne v. Meeres, 1 Vern. 465, 2 Brown, Ch. 177, note to Heathcote v. Paignon; Attorney General v. Vigor, 8 Ves. 256, 283. Cases are not unfrequent in equity, where the court, upon setting aside a conveyance, has left some benefit to the grantee. But that is done only where there are circumstances, which do not immediately affect the party, against whom the decree is sought, with an original and meditated fraud; or if he holds a derivative title, where that title was attained without knowledge of the fraud. Such was the case of How v. Weldon, 2 Ves. Sr. 517, (see, also, Proof v. Hines, Cas. t. Talb. 111; Grove v. Watt, 2 Schoales & L. 492,) where an assignment of prize money having been obtained for an inadequate consideration, it was set aside even in the hands of a second assignee, but admitted, however, to stand security for the original purchase money. In Bennet v. Musgrove, 2 Ves. Sr. 51, Lord Hardwicke decreed a conveyance of land, which was made in fraud of creditors, void so far as respected a creditor, who had taken the same in execution on an elegit. And he is reported to have said, that "whether the party could recover (at law) or not, he is entitled to come into this court; the distinction in this court being, where a subsequent purchaser for valuable consideration would recover the estate and set aside, or get the better of a precedent voluntary conveyance, if that conveyance was fairly made without actual fraud, the court will say, take your remedy at law; but wherever the conveyance is attended with actual fraud, though they might go to law by ejectment and recover the possession, they may come in to this court to set aside that conveyance; which is a distinction between actual and presumed fraud, from its being merely a conveyance." I do not cite this case to shew, that the grantee was permitted here to retain a benefit; for Lord Hardwicke, (whose decision seems very imperfectly reported) did not intend such benefit, but he considered the conveyance void for meditated fraud, though he seems to have thought there

might be some difficulty in establishing that at law. He set aside the conveyance, so far as respected the creditor, as void against him; and he having an elegit executed on the land, this was all that the case required; for it will not be pretended, that the conveyance was void as to third persons. What I cite it for is to show the distinction between actual and constructive fraud. The former makes the conveyance "utterly void," as to creditors and others, whom it intends to injure, and therefore it cannot be permitted to stand as to them as a security for advances. But if no such actual fraud was originally in contemplation, but the law adjudges the conveyance fraudulent on motives of public policy, as in cases of voluntary or other conveyances, which are void against creditors and purchasers, there, if any advances have been made, or any other equities arise, they may be enforced by the court in favor of the grantee. In the present case it appears to me, that the court is bound by the strict rule. The conveyances were in their very concoction fraudulent. They were, therefore, in the language of the statute "utterly void" as against creditors; and cannot be permitted to stand as a security for any advances subsequently made, or any pretended debts then due. All the reasons of public policy, so forcibly urged in Sands v. Codwise, 4 Johns. 598, against such an allowance, command the court to be rigid in denying to those, who are guilty of bad faith, any such indulgence. Let them reap the due reward of their own misconduct.

I have hesitated as to the nature of the decree, which ought to be made in this case, whether under all the circumstances to hold the respondents according to their respective interests liable to account to the plaintiff for the full value of the estates conveyed with interest, as a fund for the payment of his debt, leaving them in possession of their estates; or to decree the conveyances void, and the plaintiff's debt a charge upon the land, and the rents and profits, which have accrued since the conveyances, giving them an election to pay the debt really due him, and in default, to order the land to be sold, and an account to be taken of the rents and profits, and out of these funds to give the plaintiff a priority of payment. I have concluded to adopt the latter course, not meaning to imply any doubt of the propriety of the former.

The only further point, on which I have paused, has been as to the extent of the plaintiff's demand. It originated in Farmers' Exchange bills, which at the time of the giving the drafts, on which the plaintiff's judgment is founded, were at a great discount. At law I am aware, that the plaintiff might be entitled to the full amount of his judgment, notwithstanding any purchase of this sort. But I think a court of equity has a right to moderate his claim; and if he asks equity to compel him to do equity. All that

in conscience he ought to claim under all the circumstances against Simon Smith is the value of the bills of the bank at the time he received them or bought them, with interest from that time to the present. I shall, therefore, direct an inquiry to be had before a master for this purpose, on which examination the plaintiff is to be examined in respect to this point on oath. A reference also must be made to the master to ascertain the rents and profits, making all proper deductions; and all further orders are reserved until the report is made.

MEM., [from original report.] Since this opinion was delivered, the doctrine in Roberts v. Anderson, 3 Johns. Ch. 371, has been overruled in the court of errors. [See Anderson v. Roberts, 18 Johns. 515.] See, also, Astor v. Wells, 4 Wheat. [17 U. S.] 487.

DECREE. This cause came on to be heard on the bill, answer, pleadings, and evidence in the case, (the due execution of all the deeds in the case being admitted by the parties) and was argued by counsel, on consideration whereof,

It is ordered, adjudged, and decreed, as follows, to wit: That the conveyances made by the said Simon Smith mentioned in the bill and answers in this cause, bearing date the fifteenth day of September, in the year of our Lord one thousand eight hundred and nine, to the said Esther Steere and Elizabeth Foster, and William Steere and the said William Foster, for two certain farms lying in Gloucester and Foster in the county of Providence, within said district of Rhode-Island, containing three hundred and thirty-five acres of land, one called the Wells farm, and the other called the Rounds farm; and also the conveyances, in the said bill and answers mentioned, made by the said Simon Smith to the said Ziba Smith, bearing date the fifteenth day of September, in the year of our Lord one thousand eight hundred and nine, for a farm or lot of land, situate in Smithfield, in said district, and known by the name of the Waterman lot, containing fifty-four acres; and also the conveyances, in the said bill and answers mentioned, made by the said Simon Smith to Darius Smith, and to Darius Smith and the said Ahab Smith, bearing date the fifteenth and eighteenth days of September, in the year of our Lord one thousand eight hundred and nine, for the farm on which the said Darius then lived, situate in Gloucester aforesaid, called the Daniel Eddy farm, lying on both sides of the turnpike road; and also the deed, in the said bill and answers mentioned, made by the said Simon Smith to the said Ziba Smith, bearing date the eighteenth day of September, in the year of our Lord one thousand eight hundred and nine, for a lot of land situate in said Gloucester, containing twenty-six acres; and also the deed, in the said bill and answer mentioned, made by the said Simon Smith to the said Ziba Smith and Simon Smith, Jr. bearing date the twenty-second day of November, in the year of our Lord one thousand eight hundred and nine, for the farm whereon the said Simon Smith then lived, situate in said Gloucester, it being all the land he purchased of John Eddy, Elijah Cooke, and Abel Potter, and is about three hundred acres, were made by the said Simon Smith with the intent to defraud his creditors, and particularly the plaintiff, and are, therefore, as to the plaintiff, utterly void.

But inasmuch as it appears to the court, that the real estate so as aforesaid conveyed to the said Darius Smith, and to the said Darius and Ahab Smith, has, with the exception of a life estate therein still held by the said Ahab, been conveyed to persons, who are not parties to the present bill, and the plaintiff seeks no relief against them, it is further ordered, adjudged, and decreed, that the said life estate of said Ahab only be subject to the debt of the plaintiff in this suit, in manner as hereinafter stated, without prejudice to the rights of persons not parties to this bill.

And it is further ordered, adjudged, and decreed, that the said conveyances before mentioned, having originated in a meditated fraud upon the creditors of the said Simon Smith, cannot be permitted to stand as a security for any debts then due to the grantees, or for any subsequent advances by them made in furtherance of the original intention of the parties thereto.

And it is further declared, and decreed, that the plaintiff has a right to be paid the principal debt due to him, with interest up to the time of this decree, and that the same ought to be, and is decreed to be, a charge on the same lands, and on the rents and profits (making all proper allowances) which have accrued to the respective respondents, or might have accrued to them without wilful default, since the estates contained in the same conveyances have come to their hands, possession, and use; and it is declared, and decreed, that the said lands, rents, and profits, are specifically holden for, and charged with, the payment of the plaintiff's said debt.

And it is further declared, and decreed, that the respondents be permitted to pay in the proportion of the value of the estates respectively conveyed to them, to be ascertained by a master, the amount due to the plaintiff for principal and interest, with costs, if they shall elect so to do, within sixty days from the date of this decree, and in that event the plaintiff is to assign to them, by conveyances to be approved by a master, all his right and title to the judgments stated in his bill, and to the debts due, and his right and title under this decree; and the respondents shall be admitted to hold the same accordingly as a charge on the same lands; but if the respondents shall not pay the said debt and costs, within the period aforesaid, then the same master is to ascertain the rents and profits of the said estates as aforesaid, which are to be paid by the respondents respectively towards

the discharge of the plaintiff's debt, and if this fund shall not be sufficient, or shall not be productive, then it is further declared, and decreed, that the master shall sell the lands so conveyed to the respondents by the conveyances aforesaid, or a sufficiency thereof, to pay the plaintiff's debt, interest and cost, at public auction to the highest bidder, in manner as shall hereafter be decreed by the court, and make due and legal conveyances thereof to the purchaser or purchasers thereof, and the respondents Simon Smith, Ziba Smith, Ahab Smith, Simon Smith, Jr., Esther Steere, William Foster, and Elizabeth Foster, shall respectively join in such conveyance or conveyances, releasing their right, title, and interest therein, and thereto, and covenanting against their own acts, in such manner as the master shall approve, and the proceeds of such sale shall be brought into this court to discharge the plaintiff's debt, and costs of suit.

And it is further declared, and decreed. that it be further referred to the same master to ascertain by an examination of the plaintiff on oath and otherwise, what was the value at which the plaintiff received the Farmers' Exchange bills for which the drafts, on which his judgments were founded, were given, at the time when he received or bought the same, and that the plaintiff is to be allowed that sum, the damages on said drafts at the rate allowed by law on the bills of the like nature, and his costs of suit, in the state courts of Rhode-Island, as his principal debt, and the interest is to be computed thereon as aforesaid; and the same master is to make his report as soon as may be, and in the mean time all further proceedings and orders are reserved for the consideration of the court.