By the Court.
Woodruff, J.
—The Court of Appeals, when this ease was before them for consideration under the demurrer to the plaintiff’s complaint (1 Selden’s Rep., 320), decided: That the assignments made by the Morris Canal and Banting Company to the State of Michigan, if executed by the *284 president and cashier without the authority of the directors of the company, were not valid to pass the title to the State of Michigan for the purposes and upon the considerations stated in the bill of complaint;
That the defendant’s testator, Thompson, having, as was by the demurrer admitted, purchased the securities in question from the State of Michigan, with notice of this defect in the title of that state, obtained no better title;
And that the present plaintiff, by the proceedings in the Court of Chancery in Hew Jersey, and the assignment from the receivers, &c., obtained a sufficient title to enable him to recover the securities, if thus held by Thompson, assuming the allegations in the bill of complaint to be true.
In our judgment, these are all the points which are to be deemed settled by the decision of that Court.
If in these particulars the case, as it now comes before us, on appeal from the judgment awarded on the trial, is the same; i. e., if it is now established by proof that the transfers, which the plaintiff seeks to avoid, were executed without competent authority, and that the defendant’s testator, Thompson, was aware of the defect when he purchased the securities in question, then we have simply to refer to the decision of the Court of Appeals and affirm the judgment.
But if such defect do not exist, or if, as between the plaintiff and the defendant, the instruments are to be taken to be duly executed, then a further question arises, upon which the Court of Appeals have not passed, viz., whether the insolvency of the Morris Canal and Banking Company, at the time whqn the transfers were made, under the facts proved herein, shall operate to invalidate the title of Thompson (the defendant’s testator), and enable the plaintiff to reclaim the securities ?
There are, therefore, before us two prominent questions. First. Whether the judgment below should be sustained upon the ground of the insufficient or unauthorized execution of the instruments of transfer ?
Or if not, then, Second, whether it should be sustained upon the ground that the company was insolvent when the instruments were executed ?
And these questions, we apprehend, are to be considered' *285 separately, and the first is to be viewed as it would be if the company was perfectly solvent at the time the instruments were executed. And, so considered, the question becomes in effect this: Were these instruments so executed that the company itself, if solvent, and in the full exercise of all its powers, would, as between them and Thompson, have been bound by the assignments?
First. In the opinion of this Court at General Term, when the cause was heard on the demurrer, (3 Sandf. S. C. R., 416,) it was deemed to be clearly settled that where the corporate seal is proved to have been affixed to an instrument by the officers to whom its custody is entrusted, and the instrument is signed and attested by the executive officers whose duty, according to the usual course of business, it is to certify and attest the acts of the corporation, and especially where such officers in fact certify that the instrument is executed in pursuance of a resolution of the board of directors, it will be presumed that they were authorized to perform the act; and it was deemed at least doubtful whether the corporation could, as against one who acted upon the faith of an instrument so attested and without notice of any want of authority, or that the attestation was not in all respects true, be permitted to impeach it by denying such authority.
Mr. Justice Paige, in his opinion in the Court of Appeals, (1 Seld. Rep., 355,) fully recognizes the presumption above suggested; and he further supports the intimation given in the opinion of this Court, above referred to, so far as to express the opinion that if the assignments had been made to the State of Michigan for a new consideration paid at the time, so as to entitle that state to the character of a bona fide purchaser, without notice of any want of authority in the officers of the company to execute the assignments, the company would be estopped from denying that its president and cashier had competent authority to execute and deliver the assignments to the State of Michigan.
It appears to us that the agreement by the State of Michigan, under which they received the securities in question, was a new consideration moving from them to the company, fully sufficient to place them, in relation to this transaction, in the position of *286 bona fide purchasers for value. The agreement recites that there was due to the state from the company, on the day of its date, for principal and interest, the sum of $823,295.83; and in consideration of the assignment of securities thereby made, and the agreement by the company to pay the sum of $100,000, on account of principal and interest, on or before the first day of January, 1844, and a like sum annually thereafter on the first day of January in each year, until the whole debt and the interest thereon should be fully paid, the State of Michigan agreed to forbear any demand, suit or process whatever, on account of their debt and interest, not only until the first day of January, 1844, but also thence onward so long as such annual payments should be made. By this stipulation the agreement operated (if the company should not make default) to extend a credit to the company, running through a period of upwards of twelve years, which must elapse before, by the installments stipulated, the whole debt and interest would be paid.
But the views of Mr. Justice Paige would still more clearly protect the title of Thompson against any allegation by the company that their president and cashier were not duly authorized to execute the assignments. There is no pretence that he had any notice that the execution of the papers was not duly authorized. It is not apparent that he could have obtained, had he sought it, any higher assurance of such authority. - He had before him what was tantamount to a certificate that the assignment in question was made, not merely by the authority of the corporation, but that it was made in pursuance of a resolution of the board of directors.
He became a purchaser for a new consideration, in money, paid at the time, and in reliance upon the assurance, which the execution of the instruments, in due and proper form, by the company gave him, and on the proper attestation by the officers to such execution.
The consideration he so paid went not merely to the State of Michigan, but it went to the benefit of the company itself, towards the satisfaction of their debt. In truth, the sale was made by their authority, and the payment of the consideration was a payment to their use. It is difficult to see why he is not, *287 in a court of equity, entitled, at least, to the same protection that the State of Michigan would be, had they received the transfer upon a consideration paid bona fide in money to the company at the time of the transfer, without notice.
Nor is it apparent that his receiving the transfer, under such circumstances, from the company, mediately, through the State of Michigan, should in equity affect his title to protection, if it would be protected, had he dealt with the company directly, at the time of the transfer to that state.
It is, however, clear that this view of the subject did not obtain the concurrence of the Chief Judge of the Court of Appeals to the full extent. He went no further than to say that a deed formally executed under the corporate seal, bears upon its face the presumption that it was executed by corporate authority. The bill, which the demurrer admitted to be true, stated that the agent of the State of Michigan prevailed upon the president and cashier to execute the instrument, without the knowledge, assent or approbation of the directors, and that Thompson knew, when he purchased, that the State of Michigan had no legal title, and had no legal power, right or authority to transfer the securities, and could give no lawful title thereto; and upon these admitted facts, the Chief Justice concludes that the company itself might impeach the transfer, and that the acts were not the acts of the corporation, and therefore the state acquired no title. And we are probably not at liberty to assume that the opinion of Mr. Justice Paige on this point was concurred in by the other members of the Court, as their views are not expressed upon that point.
We pass, therefore, to the important inquiry whether the facts proved warrant the conclusion that the transfers were executed without competent authority ?
By the charter as amended (act of March 5, 1836, § 4), it is provided that “ the corporate powers of the company shall be exercised by a board of directors, to consist of twenty-three persons, who shall elect a president annually from their body, and possess the other privileges and powers already conferred by law.” Among the powers previously conferred upon the corporation, and to be exercised by the president and directors, was the power “ to adopt, establish and carry into execution such by-laws, ordinances and regulations as shall by its president and *288 directors be judged necessary and convenient for the said corporation, in respect to its canal and banking operations, in the charter afterwards mentioned, and the same to change, alter,” &c. ( § 1 of act of 31st December, 1824.)
Upon these provisions, we observe, that every power, which this creature of the statute possessed, either expressly given or necessarily implied in the act of incorporation, is a “ corporate power,” and every act of whatever kind which can legally bind the company, must be done under its “ corporate powers,” and in “ exercise ” thereof. And yet, we apprehend it would be nowhere claimed that when the legislature, by the amendment above cited, declared that the “ corporate powers shall be exercised by a board of directors to consist of twenty-three persons, ” &c., they meant, that no part of the business of this immense corporation, with its large capital, to be variously employed and invested, should be transacted except by the board itself in actual session.
All that this provision can be reasonably held to import is, that the board of directors shall have the control and management of the affairs, and the subordinate agencies employed therein, shall act by the authority or with the sanction of the board. And this authority and sanction may be gathered from a formal act of authorization under resolution, from the ordinances and by-laws duly enacted by the board, or from a course of business with the continued acquiescence of the directors, having full knowledge on the subject.
We are not, however, left to any general inquiry, after the reasonable interpretation of the language in question. The power to adopt and carry into execution such by-laws, ordinances and regulations as by the president and directors shall be judged necessary and convenient, is expressly given by the charter, and that power was exercised.
The by-laws of the company, adopted June 10th, 1836, provide for stated and special meetings of the board of directors, for the appointment of various officers and agents of the company, prescribe their duties, and the duties of standing and special committees, and make other regulations, obviously essential to the management of the corporate business; and the first of these laws enacts that “five directors, of whom the president shall *289 always be one, or, in his absence, seven directors, shall form a quorum for the transaction of the ordinary business of the company.”
It cannot, we think, be reasonably insisted that this was not a lawful regulation. It does not conflict with the general doctrine, that in the absence of specific provision on the subject, a majority of the board of directors must be present to constitute a quorum for the transaction of business, which requires the action of the board itself. It is sustained by the same principles, which warranted the board in conferring power upon the cashier, in respect to the daily transactions of the bank, or upon the various lock-tenders, toll-gatherers, or other agents along the line of its canal, in respect to their departments of duty, or in entrusting any branch of its business to committees of the board. Obviously, the power to make by-laws and regulations would be idle and nugatory if business done in pursuance thereof, and in the manner therein prescribed, must nevertheless be held invalid, unless further specifically authorized by the whole board. In the case of Holcomb v. The Managers of the New Hope and Delaware Bridge Company, (1 Stockton, 460, 461,) where a mortgage was held invalid because not authorized by a legal quorum, it is to be observed the charter itself declared what should be a quorum of the Board, and that was conclusive. In Leggett v. Franklin Bank, (Saxton Ch’y R., 541,) the charter was silent as to the subject of a quorum, but committed the management of the affairs of the corporation to a board of eleven directors: in that respect it was similar to the charter of the Morris Canal and Banking Company, and-the execution of the instrument not having been authorized by the board, and there being no by-law on the subject, the decision was made to turn upon the question, what powers had been conferred upon the committee who authorized the act.
In Palmer v. Yates (3 Sandf. S. C. Rep., 137,) the power to make by-laws, &c., in terms very nearly identical with the words employed in the charter under consideration, was held to authorize the distribution of the business into departments, with powers much more full than it is requisite to claim for the quorum established by the by-law now in question.
It was proved on the trial herein, that the negotiation with the State of Michigan, under which the transfers in question *290 were made, was conducted with the knowledge and acquiescence of the directors, at a meeting at which five directors, of whom the president was one, were present, November 5th, 1840.
That at a meeting, at which five directors were present, of whom the president was one, held on the 31st day of December, 1840, the agreement bearing date the ninth of that month, upon the validity of which the rights of these parties depend, was presented and read, and the same was unanimously affirmed, and the executive officers were authorized to comply in all respects, with the provisions thereof. If this gave a sufficient sanction to the agreement, then, obviously, the act of formal assignment, under date the 26th day of April, 1841, by which the bond and the new mortgage subsequently obtained and now in question were assigned, being a compliance with the agreement, was properly executed and delivered by those executive officers.
The reason assigned for impeaching this act, in affirmance of the agreement of December 9 th, is that such an agreement was not within the by-law authorizing five directors (as a quorum of a board regularly convened, and at which the whole might be present if they thought proper,) to transact the ordinary business of the company.
What, then, under such a by-law is to be deemed “ ordinary business?” It certainly embraced business which was not within the usual and daily range of duties performed by the cashier, clerks, and agents engaged in the conduct and management of the details of the canal and banking business. It contemplated the performance of business which, but for the by-law, would have required the action of the board, at a meeting at which a legal quorum of the whole number of directors was present.
It plainly did not contemplate such business, as in the daily conduct of the affairs of the company in its banking and canal operations, were within the powers and duties of the cashier of the bank, and the various agents in their service, along the line of the canal. For this the powers of these agents and officers were already adequate. And this embraced the receipt of moneys, and the- payment of the debts of the corporation from time to time. For this the president and cashier, or either of *291 them, required no action of the board. What was in this bylaw termed ordinary business was some business which had not been parceled out to the officers and subordinate agencies of the corporation. It was not ordinary in the sense of being a part of the transactions which belonged to their accustomed duties, because, for these, no action of the directors was necessary. It was therefore business which those officers had no authority to do, and which required the specific action of the board of directors itself.
The reason why it is claimed that this transaction required the action of the board, is not that the officers had not already sufficient authority to pay the debt in money, but that the arrangement in question required a transfer of securities, and the use of the corporate seal; and it is difficult to see why, if anything that requires the action of the board of directors could be called ordinary business, the making provision for the liquidation and settlement of a present debt, by such securities as were available for that purpose, is not properly so denominated.
It is true that the amount of securities transferred was large, but not disproportioned to the debt which the company owed to the state. So far from this, the nominal amount of the securities was more than $250,000 less than the debt actually due. The company was engaged in the management of a large capital (according to its charter and the supplements thereto, over four millions of dollars ), with authority to issue bills for circulation to the amount of two millions. Its pecuniary transactions, connected with banking and dealing in exchange, &c., were very heavy. If not a transaction which can be called ordinary, as within the powers of the president and cashier alone, it does not seem to us an extraordinary transaction, that when they had not the cash in hand they gave security for payment to the átate at a future day. Of all acts which can be suggested, which required the specific authority of the board of directors, this seems to us as much, if not more than any, entitled to the design nation of ordinary business, and as such to be plainly within the by-law referred to.
We find no warrant in the proofs for the suggestion that this transaction operated or could operate to break up the corporation or defeat the object of its creation; on the contrary, its tendency, *292 so far as we can discover, in connection with an arrangement, at about the same time, made with the State of Indiana, was to relieve the corporation from urgent claims, which they were not then prepared to pay in money, and create the belief, and did in truth create the belief in the minds of all parties, that the affairs of the company would thereafter prosper, and its liabilities be all paid.
The meaning of the term “ordinary business ” in this by-law, is not left to be determined alone by considerations of the nature suggested. An examination of such other of the by-laws as are contained in the case, suggests that they furnish a safe and reliable guide to the sense in which, in the by-laws, those words are used. It is obvious that if the whole system of by-laws taken together shows that, within the sense of those laws, some business is extraordinary, it is business of that description which, in the construction of the laws themselves, is to be deemed excluded from the power to transact ordinary business; or, in other words, where the by-laws, in effect, define what is extraordinary business, which the quorum of five or seven may not do, they show that it is the intent to describe other business, requiring the action of the board, as ordinary business, which they may do.
And, first, the quorum of five or seven cannot alter the bylaws themselves. Those laws are the foundation of their authority, and are prescribed to them by what, in relation to such a quorum, is a higher power.
Again,, and for the same reason, that quorum are not'authorized to do any act in contravention or violation of the by-laws. Thus, rule 8th forbids the releasing of a debtor where the debt arises from an over-draft. Though the whole board may practically suspend or repeal the by-law and give such a release, the limited quorum of five or seven clearly are not authorized to do so.
Again, rule 16th provides that on an election to fill a vacancy 'in- the board of directors, the votes of a majority of the whole number of directors shall be requisite to a choice: Such an election is thus clearly made special or extraordinary business, and is without the definition of ordinary business, mentioned in the rule under consideration.
*293 Again, by rule 19th, there shall be no new emission of bank bills, nor shall any be signed otherwise than in pursuance of a resolution, which shall be passed at a stated meeting at which the president and at least eight of the directors shall be present.
And once more, by rule 22d, there can be no election of a cashier or assistant cashier but by the votes of a majority of all the directors.
The parties did not think proper to put in evidence all of the by-laws, (being thirty-one or upwards,) and whether there are any more, containing specifications of business, which is excluded from the designation of ordinary business, in the first by-law, we have no means of knowing, but in each of four out of twelve, which are in evidence, are specifications which exclude the business mentioned therein from the operation of rule 1st, which commits “ ordinary business ” to the quorum, which may consist of five or seven as therein specified.
And it seems to us a sound construction of these by-laws, that by providing, in the first and leading regulation, that five directors, of whom the president shall always be one, or in his absence seven directors, shall form a quorum, for the transaction of the ordinary business of the company, and then by the subsequent rules giving specifications of business, which shall require the concurrence of a greater number, they have furnished a clear guide to the sense in which the word “ ordinary ” is used. These by-laws were the scheme of the management under the charter. The whole is to be construed together. Each part, in connection with the rest, and as a part of the whole. The term ordinary may embrace the execution of contracts, agreements, deeds and other instruments requiring the corporate seal; and having given power to transact ordinary business to a quorum of five or seven, the rules show what is meant, by excluding certain acts from its operation. It seems to us that the maxim, expressio unius est exelusio alterius applies, and that business which is not thus excluded is to be deemed embraced in the power which is conferred, where, as in this case; the terms are such as may reasonably embrace it.
The term “ ordinary business,” used as it is in reference to business which requires the action of the directors, is not in itself of a clear and unequivocal meaning, and being employed *294 as a means of discrimination, it seems to us, that this specification of what business shall require the action of the larger number or the whole of the directors, furnishes the only sound explanation of what would otherwise be ambiguous.
The view we have taken of the validity of the execution of the instrument is much strengthened—if, indeed, an independent ground of support is not furnished—by the facts, that the act was notoriously and publicly done; it was a transaction of great importance to the company, relieving them from a heavy claim, of a most urgent nature, preventing if not releasing a suit in Chancery, which threatened to enjoin the company’s operations. It was regularly entered on the Book of Minutes of the transactions of the board of directors, who, according to the by-laws, held weekly meetings, and for some ten or eleven months the operations of the company were regularly continued, and the transaction was acquiesced in and presumptively assented to with full knowledge of the whole matter. The company, during the whole remaining period of its existence, never impeached nor questioned the validity of this transaction. They had and enjoyed the full benefit of all the advantages which the agreement secured to them. That acquiescence and assent will have the effect to bind the corporation, we apprehend is not at this day questionable. “A corporation may approve of the unauthorized acts of its agents, and make them its own. It may be shown by express acknowledgment, or may be inferred from circumstances.” ( Saxton’s Ch'y R., 556, and cases cited; Angel and Ames on Corporations, passim, 2 Sand., 52.)
Under all these circumstances, we think it ought not to be held, and cannot reasonably be held, that, so far as the title of Mr. Thompson depends on the question whether the instruments were executed by the due authority of the corporation, there is any defect therein, which entitles the plaintiff to reclaim the securities.
The plaintiff seeking to make such a reclamation, as against a purchaser, for a tona fide consideration paid, without notice, if he be permitted to allege such want of authority, should be held to make the proof clear, that the execution of the instruments was unauthorized, and, as we think, should have shown clearly a fraud on the company, perpetrated by those who executed the instruments.
*295 That an actual and purposed fraud has been proved is not claimed, and we think that no constructive or legal fraud is made out affecting the defendant.
II. The next, and in our judgment the only remaining important question is, whether the insolvency of the Morris Canal and Banking Company, at the time when the transfers were made, should operate to invalidate the title of Thompson.
1st. Let it be assumed, for the purposes of this question (in accordance with the finding of- the Court at Special Term), that the company was in truth insolvent, and unable to pay its debts in full, at the time the transfer was made to the State of Michigan.
We are not satisfied that the plaintiff has shown that the officers of the State of Michigan were aware of the fact, or even that the officers of the company knew it at the time. (15 H. Y. Rep., 139, &c., 199, &c.) On the contrary, although Stuart, the state treasurer, commenced his proceedings for the enforcement of the rights of the state, and prepared a bill in Chancery alleging the fact of insolvency, yet it appears by the plaintiff’s own evidence, (the report of the treasurer to the state,) that when the negotiation and transfer were actually made, he had become satisfied that the company had effected such arrangements, that they would recover from their embarrassments, and would be able to pay off all their debts.
Actual knowledge of their condition he clearly had not; and when a party has notice of circumstances putting him upon inquiry, and he does in fact, with due diligence, inquire and becomes satisfied either that the suspicions, which had been awakened, were unwarranted, or that a change in the circumstances has obviated the grounds of apprehension, then he is to be regarded as acting Iona fide, and without notice of the fact of - insolvency. (Williamson v. Brown, 15 N. Y. Rep., 354; Ware v. Egmont, 31 Eng. L. and Eq. R., 97.)
And the condition of Thompson in this respect was, we think, much stronger. Even if he saw the report of the treasurer to the State of Michigan, and the other public documents connected therewith, he was thereby notified that the arrangements made were such as to relieve the company from what then appeared to be only temporary embarrassments, and the continuance of *296 the company to carry on its business, for months after, confirmed that information. We think, moreover, that the evidence was too loose and indefinite to warrant any finding that Thompson ever saw or knew the contents of the bill in Chancery, or the treasurer’s report. Indeed, the finding itself, bearing on this point, is quite as indefinite as the testimony on which it was founded.
That finding is, that “ the papers connected with the claim of the state were examined by said Thompson, or his attorney and agents.” Here is no finding that Thompson, when he purchased, knew or suspected, or had reason to know or suspect, that the company was insolvent, when the transfer was made.
The “papers,” which, it is found, Thompson examined, are not identified, nor referred to other than the agreement of the 9 th day of December, 1840, so that we can learn from the finding what knowledge he had, or might have derived from them. It does not, we think, consist with due or just caution in the administration of justice to hold, upon a finding so vague, that Thompson had such notice as to impair his title, and especially when a claim of such serious magnitude depends, in any degree, upon the specific knowledge which he had or might have acquired.
It is suggested that the purchaser of a chose in action not negotiable, whether he buy with or without notice of the defect in his assignor’s title, cannot be in a better condition than the party from whom he purchases. (Brandon v. Brandon, 89 Eng. L. and Eq. R., 188.) To this rule, in its broad generality and comprehensiveness, we cannot accede; we think many examples might be given applicable to choses in action, as well as to chattels, in which the contrary is true, in analogy to the rule that goods purchased by fraudulent representations, and actually delivered, and afterwards sold, to bona fide purchasers, for value, in the usual course of business, cannot be recovered back by the vendor. (Mowrey v. Walsh, 8 Cow. R., 288; Root v. French, 13 Wend. R., 570; Andrew v. Dieterich, 14 Wend. R., 31; 1 Paige R., 492; 3 Duer S. C. R., 373; 2 Mason R., 252.) And the general doctrine is familiar, that assignments to trustees for the payment of debts, although impeached in equity for some illegality or fraud, as against creditors, will be upheld, so far as to *297 protect bona fide purchasers for value in their purchases from the assignees, prior to any impeachment of the assignment by creditors who alone can allege the invalidity. (See 9 Paige R., 132.)
And this is more especially true, when the statute of New Jersey, which is relied upon, expressly saves the rights of bona fide purchasers without notice.
The terms of the statute, in this saving clause, probably relate to purchasers from the corporation. But their spirit, and we apprehend their just force and meaning, must include, within the same saving, bona fide purchasers from an immediate grantee or assignee.
In this aspect of the case, if it be conceded that the State of Michigan had notice of the insolvency of the company, and could not, for that reason, retain the title as against the creditors of the company, still the corporation, as such, could not impeach the title. The transfer was at most according to the very terms of the statute, only void as against creditors. It was then in the hands of the State of Michigan prima facie valid as against all the world—actually valid as against the company; it clothed the state with authority to sell, and, while the transfer remained wholly unimpeached, the claim was sold in good faith, for present value paid, to Mr. Thompson. A court of equity must, we think, protect the latter; and yet, by the judgment below, the plaintiff is permitted to set aside the transfer, without even the condition of refunding what was paid by the purchaser. It is the practice of Courts of Chancery, in the setting aside of assignments in trust, which by statute are declared fraudulent and void, as against creditors, to protect even the assignees themselves, though parties to the instruments, if they have acted in good faith. Their bona fide execution of their trust, so far as it has been done before notice of any impeachment of the assignment, and the dealings of third persons acting in good faith, in reliance upon the assignment, are upheld. (4 Paige R., 42.)
The uniform favor with which bona fide purchasers are regarded by courts of equity, and the protection extended to them, when relief is sought in equity against fraud or other ground of equitable interposition, should sustain the title of Thompson, even though the title of Michigan was liable to impeachment by the creditors of the company. (Story’s Eq. Jur., *298 1st Ed., p. 415, eh. 7, § 434; p. 396, § 409; pp. 398, 399, §§ 410, 411; p. 373, § 381; p. 75, § 57; and numerous cases cited in the notes to these sections.)
A like analogy is found in the rule which protects a Iona fide purchaser from a fraudulent grantee of lands, whose deed is by statute void as against creditors. (Anderson v. Roberts, 18 J. R., 515.)
2d. But there is another aspect of this branch of the case, which to our minds is conclusive against the plaintiff, although the State of Michigan and Thompson, (either or bdth of them,) be deemed to have had notice of the insolvency of the company when the transfer to the State of Michigan was made.
The property transferred (to which the present inquiry relates,) was a mortgage upon the property of a New'York corporation, in this state, and the agreement which is sought to be impeached was executed here. The subsequent sale to Mr. Thompson was made here, and the property was here assigned to him.
Now, in dealing with these securities, once held by the Morris Canal and Banking Company, we deny that the purchaser was, in order to constitute him a bona fide purchaser, and to confer 6n him a valid title, bound to look beyond the charter of that company, or inquire what were the general laws of New Jersey in regard to the powers and duties of their corporations.
By courtesy, foreign corporations are permitted to come, (so far as that term can be applied to such bodies,) into this state, deal, buy and sell, and carry on business. They come with their charters as their warrant of authority from the state by which they are created; our citizens are not bound to inquire into the general laws of such other state, to see whether restrictions exist in limitation of the authority contained in the charter.
The question is not whether this state or the courts of this state, will recognize and give effect to an actual transfer of property effected by force of the laws of another state, or the adjudication of its courts; but whether a person here, dealing with property here, is to be defeated in his title because it was acquired under circumstances which, the laws of New Jersey declare, render it illegal.
Upon the face of its charter, the Morris Canal and Banking *299 Company had as clear a right to sell or transfer the debt which the Long Island Railroad Company owed, as an individual would have had, and that debt was as much the subject of sale or transfer as any other species of personal property. And as a power incident to its corporate existence, unless there was some express or implied restriction, it had authority by the common law to sell and transfer these securities at its pleasure.
Of the powers existing under the charter, and where that is silent, of the common law powers of such corporation, our citizens have notice, and they may act upon faith thereof.
Suppose, then, for illustration, that one of our citizens should purchase at a public sale at auction, from a citizen of New Jersey, a horse (as Mr. Thompson purchased this debt, in pursuance of an express authority given to the State of Michigan to sell the debt), and the purchaser of the horse knew that the vendor was insolvent at the time, and was a resident of New Jersey, no one, we apprehend, would for a moment claim that the purchaser’s title could be defeated, if it should be found that by the general law of New Jersey all sales and transfers of property by any person, being insolvent, are declared void as against creditors.
We think, there is a plain distinction between acts of the foreign corporation, which the charter does not authorize, or which it may forbid, and acts which, upon the face of the charter, are authorized, but which the general laws of the foreign state may prohibit.
And that our citizens acting here in dealing with or in relying upon the acts of such a corporation, are bound to notice .and regard the provisions of such charter, bat are not affected by, nor bound to notice, the general laws of the foreign state, although they may restrain the powers of such corporation, under the charter.
That whether the Morris Canal and Banking Company was or was not solvent, and whether or not its condition was, in that respect, known or not, it had power and authority by the charter, as well as under the powers incident to corporate existence, by the common law, to make the transfer to the State of Michigan, and that transfer authorized the sale to Thompson; his purchase was legal and valid under both the charter of the company and *300 the laws of this state; and this, we think, is sufficient to sustain his title.
Mr. Justice Comstock says, in Curtis v. Leavitt., above cited (15 N. Y. Rep., at p. 51), subjects of a foreign country are not even chargeable with notice of a statute of this state: “Our statutes are usually regarded as facts of which the foreigner is presumed to have no knowledgeand Mr. Justice Paige, in the same case (pp. 192, 193), in considering the rights of certain parties, who claimed to be Iona fide purchasers in England without notice, discusses this point, and, among other things, says, “ they are not chargeable with knowledge” of our statute, “and will not be presumed to have notice of the same.”
If the citizens of a foreign state are not, on a question of Iona fides, to be deemed chargeable with notice of our laws, it is equally clear that our citizens, in dealing with a foreign corporation, acting within the scope of powers conferred by its charter, and also within powers incident to its existence as a corporation at the common law, of which latter the jus disjponendi is one, are not chargeable with notice of the general statutes of the foreign state, which may affect or limit such authority.
3d. The observations which have been so far made, in relation to the effect of the insolvency of the Morris Canal and Banking Company, proceed upon a concession or assumption, that the company was insolvent at the time of the making of the agreement in question, within the meaning of the statute of New Jersey; and those observations tend to show, that, under that concession, it does not follow, that the title of Mr. Thompson was invalid, either as against the company or its creditors. We have presented those views, because it was found by the Court, at Special Term, as a fact in the case, that the company was actually insolvent, and that the transfer of these securities was made in contemplation of its insolvency; and the conclusions thereupon show, that by this wag meant, that the company was insolvent within the meaning of the statute of New Jersey, and that, within that statute, the acts were done in contemplation of such insolvency, and are therefore void.
We are not able to concur, in the finding, that the acts, the validity of which is questioned by the plaintiff, were done in contemplation of insolvency, within the New Jersey statute, nor *301 in the conclusion that if the subsequent developments showed that the company was in truth at that time insolvent, such fact would render the transaction invalid.
• On this branch of the subject our first inquiry is, what is the true construction of the statute referred to; and under what circumstances are transfers by a corporation void by that statute ?
The entire statute given in evidence, as appears by Exhibit 12, of the case, has not been printed, but the original exhibit was by stipulation to be referred to on the hearing.
The title of the statute itself, “An act to prevent frauds by Incorporated Companies," gives us a general intimation of the object of the statute, and its several provisions show that its design was to secure an honest and Iona fide administration of the affairs of the corporation, so long as its business was continued in due course of management, for the purposes of its incorporation, and when that failed, by reason of insolvency, then an equal or ratable distribution of its assets, among the creditors, without distinction or preference.
Passing over many provisions, to secure the stockholders and others against the dishonesty and defalcation of the officers, it is in other respects a bankrupt act, for the winding up of its affairs and the distribution of its assets, through receivers to be appointed.
Its various reservations in favor of bona fide dealers show, that it was not intended to invalidate payments made, or securities given in good faith to honest creditors, merely because it ultimately appeared that had the company been wound up at the time, its assets would not have proved adequate to the payment of all its debts. Such a construction would enable receivers or those succeeding to their rights, and, probably, the plaintiff in this cause, to follow back the history of the Morris Canal and Banking Company, and by the aid of after-results show, at what early day the affairs of that company came to a condition in which its assets would not in fact meet its liabilities, and recover back all moneys thereafter paid, however justly due to those who received them, and all securities given to creditors, in due course of business, even though made to promote the prosperity of the company, and prevent sacrifices, in the fullest *302 belief that the company could and would pay all its debts, and without any other purpose or design.
If we were without the, aid of the construction given to this act, by the Courts of the State of Hew Jersey herself, we should feel constrained to hold, that the purpose of the act and its true construction was to prevent actual frauds by the officers on the one hand, and on the other to prevent transfers which would be a fraud upon the act itself, regarded as a bankrupt law, for the equal distribution of the assets through the receivers, for whose appointment it provides; and that transfers which, with this latter view, are forbidden, are such as are made for the purpose of securing preferences to favored creditors, contrary to the general scope and purpose of the act.
Such transfers are forbidden by the second section of the act, which is mainly relied upon in this case as rendering void the transfers under,which the defendant’s testator Thompson held the mortgage in controversy.
Under this construction of the act, payments from time to time made by the company in redemption of its bank bills; payments of its post-notes, which by its charter it was authorized to issue; the settlement of its balances with other banks; payments to its employees; to its depositors upon their checks, and to others having claims, arising in its transactions as agent for others; payments of bills of exchange, are all valid payments, so long as the company continued its business in good faith, without any design to thereby divide out its property to favored creditors; and, in the same view, securities given to creditors in lieu of present payment, with no other purpose than to provide for ultimate payment, and better to enable the company to continue its business, are also valid.
But we are not without the aid of interpretation given to this statute, by the Courts of Hew Jersey. I need hardly say, that the exposition of her Courts is to be taken by us as conclusive. • It is the voice of the state herself, speaking by the authorized expounders of her own laws, and their interpretation is, we apprehend, to be received with the same force as if that interpretation was incorporated in the statute in terms.
In The Receivers of the Peoples Bank v. Paterson Savings Bank, (2 Stock. Ch’y Rep. N. J., 13,) the construction of this statute *303 with express reference to the second section here relied upon, came under review before the chancellor of that state. He refers to cases in that state, which declare the statute in all its essential elements a bankrupt law, and applies to it the general principles governing the construction of the bankrupt laws of England and of the United States by the Courts of' England, New York, and the United States Courts. He says that the cashier of a bank may, under ordinary circumstances, “lawfully meet all demands made upon it up to the moment the bank suspends payment, and all such payments are valid.” “ The diligent creditor may acquire rights that the law will not disturb. There is a distinction between a voluntary preference of a creditor by the debtor, and a payment forced from him by an importunate creditor. This distinction is fully recognized in the administration of the law in reference to bankrupt acts.”
“ The object of 1 The act to prevent frauds by Incorporated Companies,’ is to secure to creditors of such institutions, an equal distribution of its assets. This is, the primary object -of the statute. Any act, done with the vieio and for the purpose of defeating this object, is a fraud upon the act, and is illegal” And in answer to the-question, why the act provides for an injunction? he says: “The injunction prohibits all payments and transfers. Without the injunction, they were all valid except such as were fraudulent; and all were fraudulent which were made in contemplation of bankruptcy, and for the purpose, not of paying their debts in the ordinary course of business, but to defeat the object of the act, and in view of insolvency giving an undue preference to particular creditors. It is very plain to be seen, that a bank may be in such a condition as to render it very proper for the Court to interfere by injunction, under the act, and yet, without such interference, the directors might go on bona fide in the ordinary transaction of the business of the bank, and all transfers made under such circumstances would be good. Why? Because they were not made in contemplation of insolvency, but to prevent that very catastrophe. The payment or transfer of property, in the usual course of trade, if made to sustain the bank and continue its business, is a bona fide payment or transfer. If contemplating bankruptcy, and in view of that, and to secure some advantage on that account, such payment or transfer is *304 made, it is not bona fide, but defeats the object of the act, and on that account is unlawful.”
And in illustration and confirmation of his views, the learned Chancellor refers with approval to the language of Lord Mansfield, in Alderson et al. v. Temple, (4 Burr. R., 2240,) and applies it to this statute. “ If a bankrupt, in course of payment pays a creditor, this is a fair advantage in course of trade; or if a creditor threatens legal diligence, (and there is no collusion,) or- begins to sue a debtor, and he makes an assignment of part of his goods, it is a fair transaction, and what a man might do without having any bankruptcy in view.”
In Holcomb's Exr. v. The New Hope and Del. Bridge Co. (1 Stock. Ch’y R., 457), the Chancellor declared the meaning and construction of the act in similar terms, and that its object was to prevent transfers to secure preferences to favorite creditors. (See Fidgeon et al. v. Sharpe, 5 Taunt. R., 539; Crosby et al. v. Crouch, 11 East. R., 256.)
This construction of the statute seems to us to relieve the title of the defendant from all imputation of invalidity, by reason of the statute of Hew Jersey, even if both the State of Michigan and Thompson were bound to know its provisions, and the transfer to the State of Michigan was to be adjudged with reference to its provisions.
The State of Michigan was an importunate creditor, claiming payment of a just debt; threatening, or actually beginning legal proceedings, and compelling thereby payment or security. Security was given and received, and time of payment extended, through a period of many years. That arrangement, in connection with other important arrangements of the company at about the same time, including a large advance of money to them by the State of Indiana, created the belief that the affairs of the company would be thereby disembarrassed, its debts be paid, and its affairs would be successfully conducted.
The evidence on the part of the plaintiff, not only shows this by the report and documents submitted to the legislature of Michigan, but the transaction itself, by the very long day given to the company to liquidate the indebtedness, is evidence of the highest character that such was the expectation of the parties. There can, we think, be no just pretence that this transaction *305 was done with a view to insolvency, or for the purpose of giving to the State of Michigan a preference over other creditors, in contemplation of insolvency. It was done with a view to the continuance of the business of the company, and to sustain it; and for a considerable period its business was so continued, and the company was sustained.
This construction of the act in question, is further sustained by the like construction of our own act, relating to moneyed corporations when insolvent, (1 R. S., 591, § 9,) which it is true does in terms speak of transfers, &c., "with the intent of giving a preference,” &c. But the use of those words, it will be seen by the cases above referred to, only introduces into the statute in terms, what is, in fact, the legal effect of the bankrupt laws of England and of the United States, and of this statute of New Jersey, without them.
Without citing cases from our own courts at length, it must suffice to refer to the elaborate opinions given in the Court of Appeals, in Curtis et al. v. Leavitt, (15 N. Y. Rep., and particularly at pages 109 to 114, 139 to 143, 175, 198 to 204,) and the numerous cases there cited and commented upon confirm the views already expressed. They define most clearly, the insolvency which laws of this description contemplate, and the nature of the transfer which is to be deemed invalid, by reason of the unlawful intent and purpose with which it is made.
The case of Curtis v. Leavitt is full of authority bearing upon the transaction under consideration, and may.be referred to for many points bearing upon and sustaining the defendant’s title, which we do not deem it necessary to discuss at length.
It is proper, however, to notice that it effectually disposes of the suggestion that the directors of the Morris Canal and Banking Company must be presumed to have known its condition at the time, and therefore to have acted in contemplation of its insolvency, and must be taken to have intended to give a preference, if that was in fact the effect of their act. No such ruléis deemed applicable to the subject. The act is in perfect consistency with the good faith of the directors, and with the belief of all parties that no insolvency was impending, or was to follow.
The case of Brouwer v. Harbeck, (5 Seld. Rep., 589,) in like *306 manner makes the validity of a transfer depend on the question, whether, there being actual insolvency, the transfer was made with intent to give a preference.
It has been already suggested that whatever suspicions, or even belief, was entertained by the agents of the State of Michigan, in relation to the solvency of the company before the agreement in question was made, those suspicions were removed, and that belief changed by the arrangements made by the company, and the aid obtained from the State of Indiana before the matter was concluded, and the company was believed to be able to pay its debts and continue its business, and did in fact continue its business.
That the temporary embarrassment which had preceded is not the insolvency contemplated by the act in question, and will not invalidate payments made or securities given, with a view to the continuance of its business, and for the purpose of sustaining the company, is, we think, apparent from the sixth section of the act relied upon.
That section - is the one which, when insolvency occurs, provides for an injunction with a view to the winding up of its affairs, and it provides for an inquiry, and the taking of proofs when a charge of insolvency is made, and “if upon such inquiry it shall be made to appear to the Chancellor that the said company has become insolvent, and shall not be about to resume its business, in a short time thereafter, with safety to the public a/nd advantage to the stockholders, it shall and may be lawful for the Chancellor to issue an injunction,” &c.
Even the Chancellor is not called upon to interfere, merely because the company is not at the moment prepared to meet its engagements, if a continuance of the business is about to begin; and surely payments made or securities given, in good faith, to relieve the company from present -embarrassment, to enable the company to continue its business, to relieve against an urgent claim of an importunate creditor, and for no other purpose, and in the belief that the company can and will sustain itself, are not within the meaning of that act to be held void—and especially when followed by the actual continuance of such business for several months.
In such a case the creditor, (there being no expectation of *307 insolvency, and no intent to give a preference in view of insolvency,) obtains what, within the proper meaning of the section last above quoted, the Chancellor, even if applied to, would permit him to have, by withholding an injunction, and enabling the company “in a short time to resume its business,” even if a suspension had actually taken place.
The fact, that the Chancellor is to entertain the inquiry, and if the insolvent corporation is about to resume its business, and may do so with safety, may withhold the injunction, shows that if the injunction be withheld the corporation may lawfully make such arrangement of its affairs as to relieve itself from immediate embarrassment, and effect such resumption, and that arrangements made for that sole purpose will be valid.
In another aspect, the case of Curtis v. Leavitt is of importance to the disposition of this case. If either the'State of Michigan or Thompson, in this state, purchasing of the New Jersey corporation a debt due in this state by a New York corporation, and a mortgage upon property here, are not chargeable • with notice of the New Jersey statute at all, but are nevertheless to be deemed in no better condition in that respect than they would be under our own statute, then the exposition of our statute in the case last mentioned shows that, upon the proofs here, there is no warrant whatever for saying that the transfers were invalid by reason of the insolvency of the company.
If our courts and our citizens are bound to act on any assumption that the laws of another state are like our own, until notice of the actual law of such other state is brought home to them, by proper proof, then the case cited shows that the views already suggested fully sustain the transfers in question.
So, if for any reason the validity of the transfers is to be judged of by our laws, in reference to an assignment or transfer by a moneyed corporation here, the same reasoning applies.
The conclusion is, we think, inevitable, that there is nothing in the proofs relating to the insolvency of the Morris Canal and Banking Company which can operate to impair the title of Mr. Thompson or the defendant to the securities in question.
The views expressed are sufficient to dispose of the case upon this appeal. We nevertheless add that, upon the facts proved, we think the decision of the court below, in regard to the effect *308 ©f the release to Mr. Griswold, was correct. We do not discuss the point at length, since the views we entertain of the other questions render a reversal necessary.
Judgment reversed and new trial ordered. Costs to abide the event*

 The plaintiff, pursuant to the statute and in order to give to the Court of Appeals jurisdiction to review the foregoing decision, stipulated that if the order reversing the judgment and ordering a new trial should be affirmed, judgment final should be entered against him, and thereupon appealed to that Court. The appeal was there argued, and at the December Term, 1858, the order of this Court was affirmed, and judgment final was ordered pursuant to such stipulation, dismissing the complaint with costs.
Before the remittitur was sent from the Court of Appeals to this Court, the plaintiff applied to that Court for a re-argument of his appeal. His motion was argued at the March Term, 1859, and at the June Term following, the ' motion for a re-argument was denied. (Hoyt v. Thompsons Ex’r, 19 N. Y. Rep., 207.